Argued and submitted September 8, decision of the Court of Appeals affirmed and judgment of the circuit court affirmed as modified December 16, 1994, reconsideration denied February 14, 1995

CITY UNIVERSITY,
a Washington corporation,
*Petitioner on Review,*

*v.*

STATE OF OREGON,
OFFICE OF EDUCATIONAL POLICY
AND PLANNING,
its Director, Paul E. Bragdon,
and its Administrator,
Academic Degrees and Program Review,
David A. Young,
*Respondents on Review.*

(CC 88C-11645; CA A70734; SC S41193)

885 P2d 701

Jacob Tanzer, of Counsel for Ball, Janik & Novack, Portland, argued the cause and filed the petition for petitioner on review. With him on the reply brief were Bruce W. DeKock and Ball, Janik & Novack.

Jas. Adams, Assistant Attorney General, Salem, argued the cause and filed a response and a brief for respondents on review. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Richard M. Botteri and Catherine S. Travis, Portland, filed a brief on behalf of *amicus curiae* Northwest Association of Schools and Colleges.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

CARSON, C. J.

## CARSON, C. J.

Plaintiff in this case is City University, a Washington corporation that operates a privately owned university. Plaintiff's administrative headquarters are in Bellevue, Washington, and it has a branch-campus facility in Tigard, Oregon. Plaintiff is a member of the Northwest Association of Schools and Colleges (Northwest Association). Plaintiff filed this action in Marion County Circuit Court, seeking a declaration that ORS 348.835(2)(c) (hereinafter paragraph (2)(c)) violates the Commerce Clause of the Constitution of the United States[1] because it discriminates against out-of-state schools with branch campuses in Oregon.

ORS 348.835 provides:

"(1)   No school or other institution of learning shall confer or offer to confer any degree upon any person, in recognition of the attainment or proficiency of such person, in pursuing or graduating from any course conducted by it, without first having submitted the requirements for such degree to the Oregon Office of Educational Policy and Planning and having obtained the approval of the director.

"(2)   ORS 348.830 to 348.885 shall not apply to:[2]

"(a)   Any school or institution of learning which has been established and conducted within this state, and has conferred degrees for a period of 15 years prior to March 4, 1935;

"(b)   Any school conducted under the public educational system of the state;

"(c)   *Any Oregon school which is a member in good standing of the Northwest Association of Schools and Colleges*; or

"(d)   Schools of theology operating on a post-baccalaureate degree level." (Emphasis added.)

---

[1] Article I, section 8, of the Constitution of the United States provides, in part: "The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes."

[2] ORS 348.830 to 348.885 set forth the procedures for Oregon Office of Educational Policy and Planning (OEPP) approval and oversight of degree-conferring schools and institutions. The OEPP has authority to approve degree programs, to revoke its approval of those programs, and to request information from and inspect the institutions offering those programs.

The trial court ruled that paragraph (2)(c) burdens interstate commerce and, therefore, is unconstitutional under Article I, section 8, of the Constitution of the United States. As a remedy, the trial court severed the word "Oregon" from the statute, concluding that "[t]he constitutional infirmity of ORS 348.835 can be remedied with the least violence to legislative intent by * * * judicially deleting the word 'Oregon' from ORS 348.835(2)(c)."

The Court of Appeals affirmed, holding that the trial court correctly ruled that paragraph (2)(c) violates the Commerce Clause. *City University v. Oregon Office of Educ. Policy*, 126 Or App 459, 466, 870 P2d 222 (1994). The Court of Appeals reversed the trial court on its choice of remedy, however, holding that it would be contrary to legislative intent to exempt non-Oregon schools that are members of the Northwest Association from the approval and oversight of the Office of Educational Policy and Planning (OEPP). *Id.* at 466-67. The Court of Appeals held that it is more consistent with legislative intent to invalidate paragraph (2)(c) in its entirety. *Id.*

The state concedes that paragraph (2)(c) violates the Commerce Clause, and it does not challenge that determination before this court. We express no opinion on that view. We allowed plaintiff's petition for review solely on the issue of remedy.

This court has held that, when part or parts of a statute are held unconstitutional, the whole statute need not be invalidated if the part or parts that are constitutionally impermissible are severable from the remainder of the statute. *Gilliam County v. Dept. of Environmental Quality*, 316 Or 99, 108, 849 P2d 500 (1993), *rev'd on other grounds sub nom Oregon Waste Systems v. Dept. of Env. Quality*, ___ US ___, 114 S Ct 1345, 128 L Ed 2d 12 (1994). Neither the state nor plaintiff argues that ORS 348.835 must be invalidated in its entirety; nor do we know of any reason to invalidate the statute in its entirety.

The parties agree that this court should sever some part of the statute; they disagree, however, on what must be severed. Plaintiff argues that the trial court was correct in deleting only the word "Oregon" from the statute and that

the Court of Appeals erred in invalidating paragraph (2)(c) in its entirety. On the other hand, the state argues that this court should sever paragraph (2)(c) in its entirety from the statute.

■ Decisions regarding the severability of statutes are governed by ORS 174.040, which provides:

> "It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

> "(1) The statute provides otherwise;

> "(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

> "(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

Thus, it is clear that the legislative preference for severing the offending language and saving the remainder of the statute is conditioned only upon three circumstances. We examine each of those circumstances in turn:

a) *ORS 174.040(1):* Nothing in ORS 348.835 provides that, if any part of the statute were to be held unconstitutional, the remaining parts should not remain in force.

b) *ORS 174.040(2):* Neither is there a contextual provision elsewhere in the relevant statutory scheme (ORS 348.830 to 348.885) that answers the question in this case. The remaining parts of the statute are not "so essentially and inseparably connected with and dependent upon the unconstitutional part" of the statute that it is apparent that the remaining parts of the statute would not have been enacted without the unconstitutional part.

c) *ORS 174.040(3):* Finally, we must determine if the statute is severable in a way that leaves the remainder of the statute complete and capable of being executed in accordance with legislative intent. As discussed above, neither party argues that the entire statute must be invalidated on the ground that the remainder of the statute may not be executed

in accordance with legislative intent. Rather, each party proposes a different severed version of the statute that each argues is *most* in accordance with legislative intent. Put simply, our task is to determine how to sever the statute in order to serve the legislative intent most effectively.

To accomplish that task, we must look to the legislative history to ascertain the intent of the legislature in enacting and amending ORS 348.835. The original version of ORS 348.835 was enacted in 1935. At that time, 5 Oregon Code Annotated (1935 Supp) § 35-206 provided, in part:

"No school or other institution of learning shall confer or offer to confer any degree upon any person, in recognition of the attainment or proficiency of such person, in pursuing or graduating from any course conducted by it, without first having submitted the requirements for such degree to the state board of education of this state,[3] and having obtained its approval of such requirements. This act shall not apply to any school or institution of learning * * * which is a member in good standing of the Northwest Association of Secondary and Higher Schools * * *."

In 1979, the legislature amended the statute to insert the word "Oregon" before the word "school" in the second sentence so as to limit the oversight exemption only to Oregon schools that are members of the Northwest Association. Or Laws 1979, ch 308, § 3(2). The legislature also corrected the name of the association to the Northwest Association of Schools and Colleges. *Id.* Plaintiff urges this court to "strike the 1979 amendment and leave the underlying 1935 legislation undisturbed." It argues that the remedy most consistent with legislative intent would be to strike the amendment and to leave the "organic" statute intact.

On the other hand, the state argues that the 1935 enactment and the 1979 amendment cannot be separated because ORS 348.835 is one statute and must be considered as a whole. The state also argues that the intent of the 1979

---

3 In 1975, oversight authority was transferred from the State Board of Education to the Oregon Educational Coordinating Commission (OECC). Or Laws 1975, ch 553, § 4. In 1987, the name of the Oregon Educational Coordinating Commission was changed to the Oregon Office of Educational Policy and Planning (OEPP). Or Laws 1987, ch 880, § 2.

legislature, which amended the statute, controls the determination under ORS 174.040(3).

■ We agree that it is the intent of the 1979 legislature that is relevant. Because the amended part of the statute was held to violate the Commerce Clause, it is the intent of the legislature at the time of the offending amendment that determines whether the severed statute is capable of being executed in accordance with legislative intent.

We are faced with conflicting legislative purposes. From the text of the statute, it is clear that the 1979 legislature intended both to continue the exemption from OEPP authority for Oregon schools that are members of the Northwest Association and to remove the exemption from OEPP authority for out-of-state schools, even if those schools are members of the Northwest Association. Because the version of the statute that serves both purposes has been held unconstitutional, one of those purposes must be sacrificed. Thus, we must ascertain the dominant intent of the legislature.

Plaintiff argues that the dominant legislative intent was to exempt Oregon schools from OEPP oversight. It argues that, by striking paragraph (2)(c) in its entirety, the Court of Appeals thwarted that dominant intent. We disagree. The legislative history strongly suggests that the dominant purpose of the 1979 amendment of paragraph (2)(c) was to give the OEPP approval and oversight authority over all out-of-state schools, regardless of their membership in the Northwest Association.[4]

Barbara Mitchell, Assistant Director of the OECC (now OEPP), testified before both the Senate and House

---

[4] The statutory statement of purpose for the legislative scheme regulating degree-granting schools and institutions provides, in part:

"It is the purpose of ORS 348.830 to 348.885 to provide for the protection, education and welfare of the citizens of this state, its educational institutions and its students. The Oregon Office of Educational Policy and Planning shall adopt by rule minimum standards concerning quality of education, ethical and business practices, health and safety and fiscal responsibility, and protecting against substandard, transient, unethical, deceptive or fraudulent practices." ORS 348.830.

That statement of purpose does not provide a clear picture of legislative intent in enacting ORS 348.835, but it does suggest that protection of the state's citizens, institutions, and students is a dominant purpose of the statutory scheme of which ORS 348.835 is a part.

Committees on Education about the proposed 1979 statutory amendments contained in Senate Bill 801. In her written testimony presented to the Senate Committee, Mitchell stated: "The substance of SB 801 is to include out-of-state institutions that are accredited by the Northwest Association of Schools and Colleges under the Commission's existing degree-granting authority." Written testimony of Barbara Mitchell, Senate Committee on Education, April 12, 1979.

Mitchell identified the two major reasons for the 1979 amendments. The first was that when out-of-state schools first open branch campuses in Oregon, their accreditation by the Northwest Association is based on the programs offered at their home campuses. *Id.* As a result, during the time between accreditation reviews by the Northwest Association, newly opened branch campuses in Oregon are not supervised or reviewed.[5] The second was that "the kind or nature of institutions now being accredited by the Northwest Association is changing. Proprietary schools and nontraditional education-focused schools that would never have been considered for accreditation 10 years ago are now in the accreditation fold." *Id.* In other words, the OECC supported the insertion of the word "Oregon" into the statute because it was concerned about protecting Oregon consumers from satellite campuses of out-of-state schools that had not been reviewed by the Northwest Association or that were accredited by the Northwest Association under new, looser standards.

Eleanor Rogers, another member of the OECC staff, also testified before the House Education Committee in favor of the proposed bill:

"I have been working with these institutions for some time and there are problems in getting information from another state institution as to the quality of its programs and its activities. * * * Without some kind of check on an institution, the Oregon Educational Coordinating Commission has no idea as to the extent of their offerings, the kind of physical facilities they're using, what kind of instructors they're

[5] The Northwest Association ordinarily conducts site visits every five years. Before the House Committee on Education, Barbara Mitchell also expressed concern that a new branch campus opened in Oregon by a school accredited by the Northwest Association could operate for five years without any review of the new facility. Tape recording, House Education Committee, May 18, 1979, Tape 51, Side I at 92.

using, what kind of library services they're able to provide. I would feel much more comfortable if the State of Oregon had some oversight responsibilities for these institutions out-of-state." Tape recording, House Education Committee, May 18, 1979, Tape 51, Side I at 113-18.

Thus, there was testimony presented to the legislature that advocated the imposition of some regulatory authority over out-of-state institutions from the time when the institutions established Oregon campuses to the time when the branch campuses would be included in the Northwest Association's accreditation review of the parent institutions.

Witnesses testifying in behalf of the bill repeatedly argued that out-of-state institutions should not be exempt *from the same review* that Oregon schools are required to undergo. For example, Don Fouts, Executive Director of the Independent Colleges Association in Oregon, also testified in favor of the 1979 amendments to ORS 348.835. He submitted written testimony that stated, in part:

"As things stand now, out-of-state institutions are free to offer degree programs in Oregon without any meaningful regulation by the state. This is in contrast to the statutory, administrative and political constraints presently controlling the degree-granting activities of Oregon colleges and universities, both public and private.

"* * * * *

"SB 801 will fill a loophole in the current law and will provide protection for our students and institutions while at the same time allowing legitimate out-of-state institutions to provide educational services here in Oregon." Written testimony of Don Fouts, Senate Committee on Education, April 12, 1979.

The "loophole" to which Fouts referred was based upon the interplay between the Northwest Association's requirements and the Oregon statutes. In order for a school to receive accreditation from the Northwest Association, it must have "formal authority from the appropriate governmental agency to grant degrees." Northwest Association of Schools and Colleges, Commission on Colleges, Accreditation Handbook 7 (1992). Thus, Oregon schools must be approved

by the OEPP before they are eligible for Northwest Association accreditation.

New Oregon schools, therefore, are not automatically eligible for the exemption contained in paragraph (2)(c). Thus, before the 1979 amendment, the only schools that truly were exempt from initial OEPP approval were Oregon branch campuses of schools where the parent schools were accredited by the Northwest Association. There were no safeguards to ensure that the Oregon branch campuses of the out-of-state schools had the same level of faculty and facilities as the main campuses. The legislature was concerned that out-of-state members of the Northwest Association that chose to open branch campuses in Oregon were subject to less front-end review than were new Oregon schools. Closing that "loophole" was the major focus of the 1979 amendment.

■ After reviewing the foregoing legislative history, we conclude that the *dominant* legislative purpose in enacting the current version of paragraph (2)(c) was to protect Oregon citizens, educational institutions, and students from schools that entered the Oregon market with no front-end review.[6] That purpose is not served by severing the word "Oregon" from ORS 348.835(2)(c). If we were to do so, Oregon schools entering the market would continue to be subject to front-end OEPP review, while out-of-state schools that are members of the Northwest Association still might begin operating in Oregon without front-end OEPP review. It would thwart the dominant intent of the legislature for us merely to delete the word "Oregon" from the statute; thus, ORS 174.040(3) does not permit us to sever the statute in that way.

On the other hand, if we were to sever paragraph (2)(c) entirely from the statute, the OEPP would continue to have approval and oversight authority over out-of-state schools starting satellite campuses is Oregon.[7] Because we

---

[6] Satellite campuses of out-of-state institutions also are subject to ongoing OEPP supervision. *See* ORS 348.845 (OEPP approval may be revoked for proper cause); ORS 348.875 (institution must file any information requested by OEPP; OEPP may conduct institution visits). As the foregoing discussion illustrates, however, long-term oversight did not seem to be the major purpose of the 1979 amendment. It was the initial, pre-establishment review that was important.

[7] Oregon schools no longer will be exempt from the continuing oversight authority of the OEPP as the legislature intended. We conclude, however, that that

conclude that that was the dominant purpose of the legislature in amending the statute, we hold that ORS 348.835(2)(c) must be severed in its entirety.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed as modified.

---

purpose was subordinate to the purpose of extending OEPP front-end review to out-of-state schools. Therefore, the remedy set forth above is the most consistent with legislative intent.