Argued and submitted October 25, 1995, judgments of the circuit court in *OSPOA, Tissue,* and *SPEU* affirmed; judgment in *Morgan* reversed and remanded in part with instructions; otherwise affirmed June 21, 1996

OREGON STATE POLICE OFFICERS'
ASSOCIATION,
Federation of Oregon
Parole and Probation Officers
and Association of Oregon Corrections Employees,
*Respondents,*

*v.*

STATE OF OREGON,
*Appellants.*

(CC 94C-14019; SC S42333 (Control))

Richard TISSUE,
LaRhette S. Swann, Darrell Wells
and Garry McCorkle,
*Respondents,*

*v.*

STATE OF OREGON,
by and through the
Oregon State Correctional Institution
and Public Employee Retirement Board,
*Appellant,*

*and*

PORTLAND SCHOOL DISTRICT NO. 1J,
Beaverton School District No. 48,
and Oregon City School District No. 62,
*Defendants-Respondents.*

(CC 94C-13963)

Dawn MORGAN,
Michael Cullivan, Ann Logan
and Paul Ferderber,
*Respondents,*

*and*

Sterling WILLIVER,
Bruce Prunk and Alice Hatch,
*Plaintiffs,*

*v.*

STATE OF OREGON,
by and through Oregon Vocational
Rehabilitation Division; by and through
Oregon Department of Corrections;
by and through State Board of Higher Education,
and City of Portland,
*Appellants,*

*and*

KLAMATH COUNTY
and Deschutes County,
*Defendants.*

(94-12-08563; SC S42511)

SALEM POLICE EMPLOYEES UNION,
Terry Locke and Jim Miller,
*Respondents,*

*v.*

CITY OF SALEM,
*Appellant.*

(CC 95-C10338; SC S42355)

918 P2d 765

358

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause for appellants State of Oregon and Public Employees Retirement Board. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Linda Meng, Chief Deputy City Attorney, Portland, argued the cause and filed the briefs for appellant City of Portland.

William G. Blair, Assistant City Attorney, Salem, argued the cause for appellant City of Salem. With him on the brief was Stephanie Smythe, City Attorney, Salem.

Daryl S. Garrettson, of Hoag, Garrettson, Goldbert & Fenrich, Portland, argued the cause and filed the brief for respondents Oregon State Police Officers' Association, Federation of Oregon Parole and Probation Officers, Association of Oregon Corrections Employees, Salem Police Employees' Union, Terry Locke, and Jim Miller.

Gregory A. Hartman, of Bennett, Hartman, Reynolds & Wiser, Portland, argued the cause and filed the brief for respondents Dawn Morgan, Michael Cullivan, Ann Logan, and Paul Ferderber. With him on the brief were James S. Coon and Lory J. Kraut, Portland.

James S. Coon, of Swanson, Thomas & Coon, Portland, argued the cause for respondents Richard Tissue, LaRhette S. Swann, Darrell Wells, and Garry McCorkle. With him on the brief were Gregory A. Hartman and Lory J. Kraut, Portland.

John W. Osborn, of Miller, Nash, Weiner, Hager & Carlsen, Portland, waived appearance for defendants-respondents Portland School District No. 1J, Beaverton School District No. 48, and Oregon City School District No. 62.

Elden M. Rosenthal, of Rosenthal & Greene, P.C., and Richard H. Braun, Portland, filed a brief on behalf of *amicus curiae* Benefits Committee.

VAN HOOMISSEN, J.

Fadeley, J., concurred and filed an opinion.

Gillette, J., specially concurred in part and dissented in part and filed an opinion, in which Carson, C. J., and Graber, J., joined.

## VAN HOOMISSEN, J.

██ The question presented by the appeals in these four consolidated cases is whether any part of Ballot Measure 8 (1994)[1] impairs an obligation of plaintiffs' Public Employes' Retirement System (PERS) contract with their public employers in violation of the Contracts Clause of Article I, section 10, of the United States Constitution.[2] Ballot Measure 8 amended the Oregon Constitution by adding three sections to Article IX. The circuit courts held that sections 10 (six percent pick-up), 11 (guaranteed rate of return), and 12 (sick leave credit) of Article IX violate the federal Contracts Clause. We agree. We hold that sections 10, 11, and 12 of Article IX violate the Contracts Clause of the United States Constitution. Accordingly, we declare sections 10, 11, and 12 void.[3]

The circuit courts' declarations that sections 10, 11, and 12 of Article IX (Ballot Measure 8) violate the federal Contracts Clause are determinations on a question of law and are reviewable *de novo. See Ragsdale v. Dept. of Rev.*, 321 Or 216, 217, 895 P2d 1348 (1995); *Post v. Oregonian Publishing Co.*, 268 Or 214, 222, 519 P2d 1258 (1974).

This court's resolution of these appeals involves few relevant facts: the enactment of Ballot Measure 8 in 1994, statutes concerning public sector employees,[4] and the existence of collective bargaining agreements and employment customs between the state[5] and its political subdivisions and employees thereof. Those matters are discussed below.

---

[1] The text of Ballot Measure 8 is reproduced in the appendix to this opinion.

[2] Article I, section 10, clause 1, of the United States Constitution provides in part:

"No State shall * * * pass any * * * Law impairing the Obligation of Contracts[.]"

Article I, section 21, of the Oregon Constitution embodies a similar prohibition.

[3] All the justices of this court are members of the Public Employes' Retirement System (PERS). Thus, each justice may have some financial interest in the outcome of these cases. Notwithstanding, the "rule of necessity" authorizes this court to adjudicate these claims. *See Hughes v. State of Oregon*, 314 Or 1, 5 n 2, 838 P2d 1018 (1992).

[4] After the 1995 legislative session, PERS statutes were recodified. Citations to the PERS statutes in this opinion are to the statutes that were in force at the time Measure 8 was approved by the people.

[5] When we use the word "state" in this opinion, we refer to all public employers that are parties to these cases.

These cases were resolved on cross motions for summary judgment.[6] In *Oregon State Police Officers' Association v. State of Oregon (OSPOA)*, plaintiffs challenged sections 10, 11, and 12. The circuit court granted plaintiffs' motions for summary judgment on their claims that all three sections violate the federal Contracts Clause and entered judgments accordingly.

In *Tissue v. State of Oregon (Tissue)*, plaintiffs challenged only section 12.[7] The circuit court granted plaintiffs' motion for summary judgment on their claim that section 12 violates the federal Contracts Clause and entered judgment accordingly.

In *Morgan v. State of Oregon (Morgan)*, plaintiffs challenged only section 10. The City of Portland filed a cross-claim for indemnity against the state, asserting that the state is responsible for any liability the city might incur as a result of the passage of Measure 8. The circuit court granted plaintiffs' motion for summary judgment on their claim that section 10 violates the federal Contracts Clause, granted the City of Portland's motion for summary judgment on its indemnity claim against the state, and entered judgment accordingly.

In *Salem Public Employees Union v. City of Salem (SPEU)*, plaintiffs challenged sections 10, 11, and 12.[8] The circuit court granted plaintiffs' motion for summary judgment on their claims that all three sections violate the federal Contracts Clause and entered judgment accordingly.

---

[6] Plaintiffs challenged Ballot Measure 8 on various constitutional, statutory, and common law grounds. This opinion addresses only plaintiffs' claim that Ballot Measure 8 violates the federal Contracts Clause, because that was the basis for summary judgment in each of these cases.

*Atiyeh v. State of Oregon*, 323 Or 413, 918 P2d 795 (1996) and *Oregon Education Association v. Keisling*, 323 Or 429, 918 P2d 803 (1996) also involve challenges to Ballot Measure 8 on other grounds. In the light of the majority's result in these consolidated cases, those two cases are dismissed this date as moot.

[7] Plaintiff Cullivan belongs to the Portland Fire and Police Disability and Retirement Plan (FPDR), which is not part of the PERS retirement system. FPDR is authorized by the Charter of the City of Portland.

[8] Plaintiff Miller is not a member of the bargaining unit that SPEU represents and he is otherwise unrepresented in connection with collective bargaining issues.

These disputes over the applicability of the federal Contracts Clause arise from the parties' markedly different view of Oregon pension law regarding the contract that the PERS represents.[9] The state contends that the circuit courts erred in declaring that sections 10, 11, and 12 violate the federal Contracts Clause. Although the state acknowledges that the six percent pick-up, guaranteed rate of return, and sick leave credit are, or at least have been, terms of the PERS contract, the state argues that those contractual promises attach only for work already performed and that the state may modify unilaterally or even eliminate entirely any or all of those terms prospectively.[10] The state relies primarily on *Hughes v. State of Oregon*, 314 Or 1, 838 P2d 1018 (1992), arguing that this court in *Hughes* construed Oregon pension law by recognizing a new concept of past, present, and future "accrual" of retirement benefits that permits the state unilaterally and prospectively to reduce retirement benefits that it offered and that were accepted by its employees, either when they first commenced work or at a time thereafter.

Plaintiffs respond that, under Oregon pension law, the state has entered into permanent contractual obligations to them with respect to the six percent pick-up, guaranteed rate of return, and sick leave credit. Plaintiffs further argue

---

[9] PERS is a statewide defined benefit retirement plan that is administered by the trustee Public Employes' Retirement Board. ORS ch 237. The Public Employes' Retirement Fund (PERF) is an express statutory trust fund, separate and distinct from the state's General Fund. ORS 237.271. *See* ORS 237.271(2) ("The State of Oregon and other public employers that make contributions to the fund have no proprietary interest in the fund or in the contributions made to the fund by them"); *see also Sprague v. Straub*, 252 Or 507, 521-22, 451 P2d 49 (1969) (the state has no proprietary interest in PERF). The State Treasurer holds the PERF as a mere custodian. PERS investments are managed by the Oregon Investment Council. ORS 293.701 *et seq*. Benefits paid by PERS are funded from three sources: employee contributions (either withheld from employees' salaries or paid by employers on behalf of employees); employer contributions; and earnings from the investment of those funds. At the time that Measure 8 was adopted, the PERF had adequate funds to pay all retirement benefits accrued and accruing in PERS.

[10] The 1995 Oregon legislature established a different level of benefits for people who begin their public employment on or after January 1, 1996. Or Laws 1995, ch 654. That level is called *Tier Two*. It has a higher normal retirement age, no guaranteed return on investments, no use of vacation pay to increase benefits, and disability retirement benefits are offset by any payments from workers' compensation. The 1995 amendments do not affect the benefits of PERS members employed before January 1, 1996.

that those obligations vested when plaintiffs accepted or continued employment and that they may not be modified or terminated unilaterally to plaintiffs detriment during the full term of their public service employment careers.[11] Plaintiffs also argue that the prerequisites of a unilateral contract have accrued and that the state already has received the benefit of their reliance on the state's promises. Plaintiffs rely primarily on *Taylor v. Mult. Co. Dep. Sher. Ret. Bd.*, 265 Or 445, 510 P2d 339 (1973).

■ Analysis of the parties' argument under the federal Contracts Clause requires this court to determine: first, whether there is a contractual relationship between plaintiffs and the state; second, if so, the nature of the contractual promises that allegedly have been impaired; third, whether a state law (here a constitutional provision) impairs any of those contractual promises and, if so, whether the impairment is "substantial"; and fourth, if so, whether the state law creating the substantial impairment is justified by a significant and legitimate public purpose and whether the method used by the state to advance that public purpose constitutes an unnecessarily broad repudiation of its contractual obligation to private persons.[12] *General Motors Corp. v. Romein,*

---

[11] In this context, the concept of "vesting" refers to the point in time after which employees cannot lose particular benefit rights, even if they stop working in a covered position.

[12] The state's opening brief asserts:

"The state does not contend in this case that if a contract exists, and if Measure 8 impairs that contract, the impairment is not substantial. Nor does the state argue in the light of *Hughes* that Measure 8 advances such significant and legitimate public purposes that, should the court conclude Measure 8 impairs contract rights, the impairment is nevertheless justified."

*See United States Trust Co. v. New Jersey*, 431 US 1, 25-26, 97 S Ct 1505, 52 L Ed 2d 92 (1977) ("The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all") (footnote omitted)). *See also* Richard A. Epstein, *Toward a Revitalization of the Contract Clause*, 51 U Chi L Rev 703, 719 (1984) (arguing that "[t]o allow a state to repudiate its contracts unilaterally * * * is to invite the very abuses of factual coalition that the contract clause was

503 US 181, 186, 112 S Ct 1105, 117 L Ed 2d 328, 337 (1992); *Keystone Bituminous Coal Assoc. v. DeBenedictis*, 480 US 470, 504, 107 S Ct 1232, 94 L Ed 2d 472 (1987); *Energy Reserves Group Inc. v. Kansas Power & Light*, 459 US 400, 411, 103 S Ct 697, 74 L Ed 2d 569 (1983); *United States Trust Co. v. New Jersey*, 431 US 1, 97 S Ct 1505, 52 L Ed 2d 92, *reh'g den* 431 US 975 (1977). *See* Laurence H. Tribe, *American Constitutional Law*, 613-28 (2d ed 1988) (discussing federal Contracts Clause); *see also* R. Rotunda and J. Nowak, 2 *Treatise On Constitutional Law*, § 15.8 (3d ed 1992) (summarizing relevant United States Supreme Court cases).

The consolidated cases on appeal do not come to this court on a clean slate, without principle or case law to guide us. Rather, these cases call for a straightforward application of well-established Oregon case law. In order to understand the essential underpinnings of that law, it is instructive to review the following cases:

In *Crawford v. Teachers' Ret. Fund Ass'n*, 164 Or 77, 99 P2d 729 (1940), a retired public school teacher sought to compel the payment of an annuity that she claimed was due her on retirement. The defendant refused to pay the annuity, arguing that, because the by-laws of the association had been amended after the teacher had retired, she was required to pay more for the same benefit. The defendant conceded that, before she retired, the teacher had paid the amount required under the former by-laws. In affirming the trial court, which had ruled in favor of the teacher, this court recognized that "contractual relations" had been created between the parties:

"[W]hen there had been full performance on the part of the plaintiff, * * * her rights became vested and no subsequent change in the by-laws could interfere with or impair such rights. Any other rule would utterly destroy all stability and security in the retirement fund plan[.]

designed to prevent, for we can be sure that almost every repudiation will provide benefits to some groups at the expense of others").

In November 1995, the state refunded about $157 million to personal income taxpayers and gave tax credits of about $166 million to corporate income and excise taxpayers with respect to their 1995 income tax obligations pursuant to ORS 291.349 (2 percent surplus "kicker" statute).

"* * * The teacher, by continuing in the service and making contributions to the fund, has, in effect, accepted the offer of the State, through its governmental agencies, to pay an annuity upon retirement at a certain age. * * * [We are dealing] with the rights of an employee to the payment of an annuity provided for under the terms of the statute which became a part of the contract. * * * As we view it, the mere fact that part of the fund might consist of contributions by the school district would not refute the idea of contractual relationship.

"While there is a great difference of opinion expressed by the courts relative to the question as to whether a teacher under similar retirement fund plans has acquired vested rights * * *, we think the trend of modern authority and the better-reasoned cases are to the effect that contractual relations are created and that, upon full performance by the annuitant, rights accrue which cannot be impaired by subsequent legislation * * *[.]" 164 Or at 86-88 (citations omitted).

*Crawford* did not decide whether an employer may unilaterally alter the terms of the retirement formula during employment, with respect to services that the employee already has performed. This court answered that question in *Harryman v. Roseburg Rural Fire Prot. District*, 244 Or 631, 420 P2d 51 (1966).

In *Harryman*, a fireman commenced work under a retirement rule that said that he was entitled to receive pay for unused sick leave on retirement if authorized by the employer, and that the system would accept unused sick leave pay as the basis for calculating the retirement benefit. The employer's sick leave credit provision was as follows:

"One (1) day per month, up to 90 days, Cash On Termination."

During the fireman's employment, the employer unilaterally revoked its previous authorization for sick leave credit on retirement. At trial, the employer argued that the allowance for sick leave credit on retirement was a gratuity and, therefore, whatever right the fireman had to any credit was terminated when the employer revoked its sick leave provision. This court rejected that argument:

"When plaintiff entered upon his employment with defendant he was advised that he would receive an allowance for accumulated sick leave upon termination of employment. He accepted employment upon the assumption that the allowance for sick leave was a part of his compensation for services. Since it was a part of the inducement to accept employment, it can be regarded as a contractual term of plaintiff's employment. Defendant could not, therefore, deprive plaintiff of the allowance after he had earned it." 244 Or at 634-35 (footnote omitted).

Accordingly, this court affirmed the trial court's judgment for the fireman.

In *Adams v. Schrunk*, 6 Or App 580, 488 P2d 831, *rev den* (1971), the Court of Appeals applied *Harryman*. The employer attempted to amend its retirement plan after the plaintiffs had commenced their employment as policemen by altering, to the plaintiffs' detriment, an existing rule governing the calculation of the period of service required for retirement. The question in *Adams* was whether the plaintiffs would get credit for their temporary service before their permanent appointments. The Court of Appeals concluded that the employer could not unilaterally amend the rule after the plaintiffs had commenced service so as to cut off their right to have their temporary service included in computing their eligibility for retirement. The Court of Appeals, *citing Crawford*, noted that Oregon had rejected the gratuity theory of pension contracts:

"We conclude therefore that the city could not by the adoption of the amendment of 1949 cut off the right of these plaintiffs, who were then and at all times since have been permanent officers, to have included the period of their prior temporary service in computing their eligibility for retirement." 6 Or App at 587-88.

Thus, in *Adams*, the Court of Appeals recognized, as *Crawford* had not, that a contractual right could be established before the completion of the service necessary for a pension. In *Taylor*, 265 Or at 450-51, this court specifically approved the holding in *Adams* that a contractual right could be established before the completion of the service necessary for a pension.

In *Taylor*, the case on which plaintiffs primarily rely here, a jail matron asserted that she qualified for inclusion in Multnomah County's retirement plan for sworn personnel. In response to her claim, Multnomah County amended its plan to delete the former definition of a covered employee, and to omit jail matrons from the new definition. The plaintiff sued to compel the county to include her in the original retirement plan. This court stated:

> "Some states continue to advocate the gratuity theory of pensions. Originally, pensions came from the largess of the king and the recipient had no vested interest. An increasing number of courts are abandoning this rationale and are adopting a contract theory which looks upon a pension as part of the employee's promised but delayed compensation for the performance of his job. Today, it can probably be said that the generally accepted theory is that of compensation and that it is possible for an employee to acquire a 'vested' right to a pension. *See* [A]nnotation, 'Vested right of pensioner to pension,' 52 ALR 2d, 437; 3 McQuillin, Municipal Corporations, 3rd ed, § 12.144.
>
> "Oregon has joined the ranks of those rejecting the gratuity theory of pensions and has held that contractual rights to a pension can be created between the employee and the employer." *Taylor*, 265 Or at 450 (citing *Crawford, Adams* and *Harryman*).

The *Taylor* court concluded:

> "Oregon has adopted not only the contractual concept of pensions, but, also, the concept that contractual rights can arise prior to the completion of the service necessary to a pension. * * * Such rights are subject, of course, to subsequent completion of the necessary service.
>
> "* * * * *
>
> "* * * The adoption of the pension plan was an offer for a unilateral contract. Such an offer can be accepted by the tender of part performance.
>
> "* * * * *
>
> "* * * [P]laintiff's tender of the contributions and acceptance of the plan terminated defendants' power to revoke the offer, and plaintiff would be entitled to the benefits of

the plan if she continued to work for the requisite period necessary for retirement." *Id.* at 451-54.

The court held that the plaintiff's tender of part performance furnished consideration for the contract. Under *Taylor*, partial performance by the employee limited the employer's power to revoke the offer of a retirement plan. Accordingly, because the plaintiff qualified under that plan when she first went to work, she was entitled to be included in the original plan.

The legal issue that *Taylor* decided was what employee response was required to make the offer of a retirement plan binding. The court's answer was "tender of performance." After partial performance, there was no question that a contract existed. Partial performance prevented the employer from revoking its subsidiary promise not to revoke the retirement plan that was offered when performance commenced.

In *Rose City Transit v. City of Portland*, 271 Or 588, 533 P2d 339 (1975), this court, *citing Taylor*, held that the adoption of a pension plan is an offer for a unilateral contract. The court also noted that

"[p]ension plans, disability benefits, and health insurance are extremely important today to all workers * * *. In fact, because of taxes, such benefits could become more important than salaries or salary increases." 271 Or at 595.

In *McHorse v. Portland General Electric*, 268 Or 323, 331, 521 P2d 315 (1974), this court stated:

"[I]n the situation where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, the better reasoned view is that the employee has a vested right to the benefits. This view sees the employer's plan as an offer to the employee which can be accepted by the employee's continued employment, and such employment constitutes the underlying consideration for the promise."

In *Gantenbein v. PERB*, 33 Or App 309, 576 P2d 1257, *rev den* 282 Or 537 (1978), the Court of Appeals recognized that Oregon follows the rule that retirement benefits

become vested at the time of acceptance of employment. *Id.* at 315 (citing *Taylor*). The court explained:

> "*Taylor* simply holds that an employe who accepts an initial retirement plan offer has vested contractual rights under the offer which cannot be altered by a second plan put into effect *after* the initial plan has been accepted by the employe[.]" *Id.* at 316 (emphasis in original).

In *Bryson v. PERB*, 45 Or App 27, 30, 607 P2d 768 (1979), *rev den* 289 Or 107 (1980), the Court of Appeals stated:

> "[I]t is without question that petitioner has a statutory and contractual right to receive retirement benefits computed at the most favorable rate applicable under laws in effect at any time during his judicial service." (Citing *Taylor*.)

Finally, in *Hughes*, the case on which the state primarily relies here, this court interpreted a state tax statute in the context of an impairment challenge under Article I, section 21, of the Oregon Constitution, to determine whether legislative amendments to *former* ORS 237.201 (1989) and *former* 316.680(1)(d) (1989) impaired the state's contractual obligation to members of PERS. *Hughes* held that, to the extent that the amendments affected pension benefits relating to pre-existing and existing work, the tax statute at issue impaired the obligations of the state's contract, which protected accrued and accruing benefits forever. *Hughes*, 314 Or at 36. *Hughes* also held that the contractual obligation of the state in that case did not extend to benefits for work to be performed in the future and that the state could accordingly, modify its treatment of those benefits without impairing the obligation of contract. *Id. Hughes* specifically reaffirmed *Taylor's* earlier analysis and holding with respect to Oregon pension law. *Id.* at 20-21.

The *Tissue* plaintiffs argue that *Hughes* was wrongly decided by this court. Although this court's interpretation of the tax exemption statute in *Hughes* is open to criticism, it is the law of that case.

In *Hughes*, this court reaffirmed that PERS is a contract between the state and its employees, and that public employment gives rise to certain contractual obligations that

are protected by the state and federal constitutions. *Id.* at 17-21. The *Hughes* court also recognized that the state may obligate itself contractually to private individuals and that, normally, general principles of contract law govern the inquiry. *Id.* at 14. Importantly, *Hughes* recognized, albeit in *dictum*, that the state could undertake binding contractual obligations with its employees to include benefits that may accrue in the future *for work not yet performed. Id.* at 28.[13]

The common thread running through the Oregon cases cited above is that the state may undertake binding contractual obligations with its employees, including benefits that may accrue in the future *for work not yet performed.* Moreover, the cases recognize that the PERS pension plan is an offer for a unilateral contract which can be accepted by the tender of part performance by the employee. The Oregon line of cases is consistent with the majority of jurisdictions that have considered the issue and also is consistent with the modern view of the nature of pensions. Most jurisdictions adhering to a contract theory of pensions construe pension rights to vest on acceptance of employment or after a probationary period, with vesting encompassing not only work performed but also work that has not yet begun.[14]

Having examined relevant case law and the parameters of Oregon pension law, we now turn to the provisions at issue in these cases. As noted, the state does not contend

---

[13] The state's opening brief asserts:

"Indeed, it is common knowledge that the state makes such promises in its collective bargaining agreements, negotiated generally every two years, which include promises for work not yet performed, but to be performed during the period of the collective bargaining agreements."

[14] *See, e.g., Yeazell v. Copins*, 98 Ariz 109, 402 P2d 541 (1965) (holding that a legislative amendment that prospectively increased employee contributions was an unlawful impairment of contract); *see also Calabro v. City of Omaha*, 247 Neb 955, 531 NW2d 541 (1995); *Assoc of State College Faculty v. Pennsylvannia*, 505 Pa 369, 479 A2d 962 (1984); *Singer v. City of Topeka*, 227 Kan 356, 607 P2d 467 (1980); *Marvel v. Dannemann*, 490 F Supp 170 (D Del 1980) (applying Delaware contract law); *Opinion of the Justices*, 364 Mass 847, 303 NE2d 320 (1973); *Bakenhus v. City of Seattle*, 48 Wash 2d 695, 296 P2d 536 (1956); *Allen v. City of Long Beach*, 45 Cal 2d 128, 287 P2d 765 (1955); *Bowles v. Washington Department of Retirement Systems*, 121 Wash 2d 52, 847 P2d 440 (1993); *Betts v. Board of Administration*, 21 Cal 3d 859, 582 P2d 614 (1978); *Petras v. State Bd. of Pension Trustees*, 464 A2d 894 (1983); *Jones v. Cheney*, 253 Ark 926, 489 SW2d 785 (1973).

that, if a contract exists, and if Measure 8 impairs that contract, the impairment is not substantial. Nor does the state argue in the light of *Hughes* that Measure 8 advances such significant and legitimate public purposes that, should the court conclude that Measure 8 impairs contract rights, the impairment is nevertheless justified. Our analysis, therefore, must focus on only two narrow questions: What are the contractual obligations contained in the relevant statutes and does Measure 8 impair any of those contractual obligations?

## SECTION 10 — SIX PERCENT PICK-UP

■ Section 10 requires that public employees contribute six percent of their wages to their retirement system; prohibits the state or any political subdivision after January 1, 1995, from contracting to pay their employees' six percent contribution; and prohibits public employers from contracting to grant pay raises to offset the effects on employees of the six percent contribution.

Before 1979, employees who were members of PERS were required to contribute a percentage of their salary to their pension plans. *Former* ORS 237.071 (1977).[15] The contribution ranged from four to seven percent, depending on an employee's monthly salary. The 1979 legislature enacted Oregon Laws 1979, chapter 538, section 3, which provided in part:

> "[A] public employer participating in the Public Employes' Retirement System may agree, by a written employment policy or agreement in effect on or after July 1, 1979, and terminating on or before June 30, 1981, to 'pick-up,' assume or pay the full amount of contributions to the fund required of all or less than all active members of the system employed by the employer. If a public employer so agrees:
>
> "(1) The rate of contribution of each employee member of the system employed by the employer who is covered by such policy or agreement shall uniformly be six percent of salary regardless of the amount of monthly salary." Or Laws 1979, ch 538, § 3 (codified at *former* ORS 237.075 (1993); recodified as ORS 238.205 in 1995).[16]

---

[15] Renumbered ORS 238.200 in 1995.

[16] When the 1979 legislature authorized the pick-up, it expressly limited the authorization to continue the pick-up to a two-year period terminating in 1981.

In response to that statute, the state agreed, by contract or other means (such as city charter, in the case of certain of the public employers herein) to pay the "full amount of contributions" for public employees.

The enactment of ORS 237.075 followed lengthy negotiations between the state and employee unions, during which employees agreed to forego a requested pay raise in exchange for a right to bargain with public employers for a six percent "pick-up." The enactment allowed the state to give employees what amounted to a six percent pay increase without increasing the state's payments to Social Security. The agreement also had significant tax benefits for the employees.

If the state stops paying the six percent pick-up and that cost is shifted to plaintiffs, the state will reduce its PERS costs by six percent of salary. Because plaintiffs will have to pay PERS six percent of their salary, they will experience slightly more than a six percent reduction in their salaries, because pick-up amounts are not considered as income and are not taxed when contributed, whereas employees pay their contributions from their taxable income.[17]

In its reply brief, the state acknowledges that *Taylor*, on its face, is susceptible to the interpretation that plaintiffs give it, *i.e.*, that once a public employer offers benefits plan terms to an employee, those terms remain as part of the employment contract so long as the employee continues to work for the employer. The state also recognizes that its proposed interpretation of its six percent pick-up commitment may contradict this court's analysis and holding in *Taylor*. However, the state urges the court to read *Taylor* narrowly. The state argues that the pension promises modified by

---

However, the statute was amended in 1981 to remove the sunset provision. Or Laws 1981, ch 373, § 1. With respect to plaintiffs' challenge to section 10, the pick-up was carried over into subsequent collective bargaining agreements until the passage of Ballot Measure 8 in 1994.

[17] Eliminating the pick-up also would reduce plaintiffs' salary used to compute final PERS pension benefits, because PERS includes the six percent pick-up in the salary used to compute a "Final Average Salary." *See former* ORS 237.075(2) and (3) (1993) (so stating). Eliminating the pick-up would reduce plaintiffs' computation salary by six percent, thus resulting in lower retirement benefits for plaintiffs.

Measure 8 are nothing more than salary, which may be modified prospectively. We disagree. Measure 8 is not about salary; it is about pensions. It may bear noting that the caption of the ballot title for Measure 8 states:

"AMENDS [STATE] CONSTITUTION: PUBLIC EMPLOYEES PAY PART OF SALARY FOR PENSIONS."

Salary and pensions are not synonymous. *See Rose City Transit v. City of Portland*, 271 Or 588, 595, 533 P2d 339 (1975) (pension plans may be more important than salary). We disagree with the state's reading of *Taylor* and believe that, in reality, the state seeks to overrule *Taylor*. This court followed *Taylor* in *Hughes*, and we continue to adhere to *Taylor* here.

Under the *Taylor* analysis, and contrary to the state's argument here, ORS 237.075, and the state's implementation of the authority contained in that statute, promised a pension benefit that plaintiffs could realize only on retirement with sufficient years of service, that is, *after* rendering labor for the state. Plaintiffs accepted that offer by working. *See Taylor*, 265 Or at 452. The change mandated by section 10 alters the state's contractual obligation, in violation of *Taylor*, by increasing plaintiffs' cost of retirement benefits for services that, absent a lawful separation of employment, they will provide in the future. That consequence, if approved, would permit the state to retain the benefit of plaintiffs' labor, but relieve the state of the burden of paying plaintiffs what it promised for that labor.[18] That result would frustrate

---

[18] Cases from other jurisdictions that follow a contractual view of public pensions likewise have concluded that legislative enactments that increased the level of public employee contributions, without providing offsetting benefits, violated either the state or federal contract clauses. *See, e.g., Booth v. Sims*, 193 W Va 323, 456 SE2d 167 (1994) (stating that a modification of a pension statute that increased employee contribution from six percent to nine percent of income, and that did not offer offsetting new benefits, would impair pension contract); *McDermott v. Regan*, 82 NY2d 354, 624 NE2d 985 (1993) (statute changing the funding method for state retirement system violated the impairment of contracts clause of state constitution); *Assoc. of State College Faculty* (holding that a modification of a pension statute that increased employee contribution by 1.25 percent of income, and that did not offer any corresponding new benefits, was an impairment of a pension contract); *Singer* (same holding with regard to doubling of employee pension contributions); *Opinion of the Justices* (same holding with regard to increasing employee pension contributions from five percent to seven percent); *Allen* (same holding with regard to increasing employee contribution from two percent to ten percent of income). *See also Marvel* (concluding that a statutory

plaintiffs' reasonable contractual expectations that were based on legal commitments expressly made by the state.

■ Once offered and accepted, a pension promise made by the state is not a mirage (something seen in the distance that disappears before the employee reaches retirement). Nullification of an express term of plaintiffs' PERS contract with the state is an impairment for purposes of Contract Clause analysis. *Allied Structural Steel Co. v. Spannaus*, 438 US 234, 247, 98 S Ct 2716, 57 L Ed 2d 727 (1978). Section 10 expressly and substantially changes the state's contractual promise to plaintiffs with respect to the cost of their participation in the PERS retirement plan and the benefits that they will receive on retirement. Under section 10, the cost of participation to the employee increases while the benefits that the employee ultimately will receive on retirement decrease. Unquestionably, section 10 impairs the obligation of plaintiffs' PERS contract.

■ The statutory pension system and the relationship between the state and its employees clearly established a contractual obligation to provide an undiminished level of benefits at a fixed cost. Under section 10, because plaintiffs must pay six percent more, the value of their PERS pension contract has been diminished unilaterally. A contrary holding would serve notice on any person who might consider embarking on a career in public service that the state's promises could well prove to be worthless, even after the employees had given consideration for those promises in the form of partial performance. The most basic purposes of the Contracts Clause, as well as the notions of fundamental fairness that transcend the clause itself, point to these simple principles: the state must keep its promises, and it may depart therefrom only for a significant and legitimate public purpose. *United States Trust Co.*, 431 US at 26. No significant and legitimate public purpose is present here. The impairment resulting from section 10 is substantial. We hold that the circuit courts did not err in concluding that section 10 violates the federal Contracts Clause.

---

amendment that had the effect of requiring a public employee's pension contribution to increase from 1.1 percent to 4.3 percent of salary was an impairment of contract). Cases cited in full above at note 15.

Justice Gillette's dissent as to section 10 would treat the six percent pick-up and *former* ORS 237.075 in isolation, outside of the broader context of the parties' PERS pension contract. The fatal flaw in that analysis is that it "errs in failing to consider the significance of context." *Hughes*, 314 Or at 21 n 27. The six percent pick-up is an integral part of the underlying PERS pension contract. Unilateral termination of the six percent pick-up term of the PERS pension contract materially changes that underlying pension contract to plaintiffs' detriment and, thus, frustrates plaintiffs' reasonable reliance on the offer the state made to them and which they accepted by the tender of part performance. *Id.* at 20-21.

## STATE CONSTITUTIONAL DEBT LIMITATION

■      The state argues that any promise by the state to create a future debt obligation from currently unappropriated, nonspecial funds monies, however express and unambiguous, would violate Article XI, sections 7 and 10, of the Oregon Constitution (debt limitation).[19]

The state argues:

"The state could not legally or validly promise employees that the state would continue for future fiscal periods to pick-up employee contributions, or to grant credit for sick leave. To do so would be to contract to pay money in the future from funds not currently appropriated or available for that purpose, which would violate constitutional debt limitations. Contracts and agreements should be construed to be valid when possible. Any doubt, therefore, as to

---

[19] Article XI, section 7, of the Oregon Constitution, provides in part:

"The Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of fifty thousand dollars, except in case of war or to repel invasion or suppress insurrection or to build and maintain permanent roads; * * * and every contract of indebtedness entered into or assumed by or on behalf of the state in violation of the provisions of this section shall be void and of no effect."

Article XI, section 10, of the Oregon Constitution, provides:

"No county shall create any debt or liabilities which shall singly or in the aggregate, with previous debts or liabilities, exceed the sum of $5,000; provided, however, counties may incur bonded indebtedness in excess of such $5,000 limitation to carry out purposes authorized by statute, such bonded indebtedness not to exceed limits fixed by the statute."

whether express and unambiguous language of promise appears, where the commitment of future general fund dollars [*sic*], should be resolved in favor of finding no such promise to have been made."

The Public Employes' Retirement Fund (PERF) is a statutory trust fund, separate and distinct from the General Fund. PERF is fully funded on a pay-as-you-go basis by employer and employee contributions and interest on its investments. Because full payment is made *in the present*, the pension benefits at issue in these cases do not create a *future* debt obligation. Moreover, the state acknowledges in its brief that it has recourse under its employment agreements to separate employees before any violation of the debt limitation would occur. Thus, Article XI, sections 7 and 10, are not implicated here.

SECTION 11 — GUARANTEED RATE OF RETURN

■ The 1975 legislature enacted ORS 237.277, which provides in part:

> "(2) The individual account for an employee member of the system shall be examined each year. If the individual account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by the board, the amount of the difference shall be credited to the individual account and charged to a reserve account in the fund established for the purpose." (Recodified as ORS 238.255 in 1995.)

The effect of ORS 237.277 was to guarantee a minimum rate of return on the individual account of each PERS member. Section 11 prohibits the state or any political subdivision from contracting to guarantee any rate of interest or return on monies in a retirement plan or system established by law.

■ Although the state concedes, and we agree, that the guaranteed minimum rate of return became a contractual obligation of the state under PERS, the state relies on the same arguments that it made in its defense of section 10. We reject those arguments for the reasons identified above in our discussion of section 10. Once the employee performs services in reliance on the employer's promise to afford a particular

benefit on retirement, the employer is contractually bound to honor that obligation. *Taylor*, 265 Or at 451-52; *Harryman*, 244 Or at 634-35. The state's promise, as material, included employee access to the return rate procedure described in ORS 237.277. Section 11 would cancel that obligation after employees partially performed their services. Moreover, section 11 impairs the obligation of contract stated in ORS 237.277, because it would entirely eliminate that obligation with respect to employee contributions to PERS made by current employees for work performed both *before* and after the effective date of Measure 8. *Hughes*; *Taylor*.

As with section 10, the impairment resulting from section 11 is substantial and not justified by any significant and legitimate public purpose within the meaning of federal impairment analysis. As noted, the state does not argue otherwise. We hold that the circuit courts did not err in concluding that section 11 violates the federal Contracts Clause.

As to section 11, this court is unanimous in holding that that section is void, albeit on different grounds.

SECTION 12 — SICK LEAVE CREDIT

The 1973 legislature enacted ORS 237.153, which provided in part:

> "Upon the request by a public employer that its employees be compensated for accumulated unused sick leave with pay in the form of increased retirement benefits upon service or disability retirement, the board shall establish a procedure for adding to the gross amount of salary used in determining 'final average salary' * * * the monetary value of one-half of the accumulated unused sick leave of each retiring employee of the requesting public employer and shall establish his benefits on the basis of a final average salary reflecting that addition." (Recodified as ORS 238.350 in 1955.)

The sick leave credit provisions of ORS 237.153 evince a clear and unambiguous intention of the legislature for the state to become contractually obligated to plaintiffs in the event that the state requested participation in the sick leave credit program. The state made the request contemplated by the statute. Section 12 prohibits the state or any

political subdivision from using employees' accumulated, unused sick leave to increase retirement benefits for any employees retiring after January 1, 1995.

We note a parallel between *Harryman* and the sick leave credit and guaranteed rate of return provisions at issue in these cases. The sick leave credit that section 12 nullifies is akin to the employer's sick leave credit authorization in *Harryman*. Although the employer in *Harryman* had a legal right to cancel its sick leave credit authorization at any time, this court held that the relevant question was whether the authorization was in effect at the start of the plaintiff's employment. Partial performance by the employee bound the employer to honor the contractual obligation that was in place at the commencement of the plaintiff's employment, thus preventing a unilateral change by the employer to the plaintiff's detriment during the period of his employment.

The state concedes, and we agree, that the sick leave credit became a contractual obligation of the state under PERS. The state defends section 12 with the same arguments that it made in its defense of section 10. For the reasons stated above, we again reject those arguments. Plaintiffs provided labor in good faith reliance on the state's promise that they would receive enhanced retirement benefits on account of accumulated unused sick leave. Section 12 would relieve the state of its contractual obligation to provide that promised benefit, even though the employees already have provided consideration for the promise by refraining from using the maximum permissible sick leave. Section 12 impairs the state's contractual obligation to plaintiffs.

As with sections 10 and 11, the impairment is substantial and not justified by any significant and legitimate public purpose within the meaning of federal impairment analysis. As noted, the state does not argue otherwise. Accordingly, we hold that the circuit courts did not err in concluding that section 12 violates the federal Contracts Clause.

As to section 12, this court is unanimous in holding that that section is void, albeit on different grounds.

## SECTION 13 — SEVERABILITY CLAUSE

Section 13 of Article IX provides:

"If any part of Sections 10, 11 or 12 of this Article is held to be unconstitutional under the Federal or State Constitutions, the remaining parts shall not be affected and shall remain in full force and effect."

*See City University v. Oregon Office of Educ. Policy*, 320 Or 422, 885 P2d 701 (1994) (discussing severability of part of a statute held unconstitutional). Because each substantive section of Ballot Measure 8 is an unconstitutional impairment of a vested contractual obligation of the state to plaintiffs, we conclude that no section can be saved.

## CITY OF PORTLAND'S CROSS-CLAIM

■■ ■■ The state contends that the circuit court in *Morgan* erred in granting the City of Portland's motion for summary judgment on the City's cross-claim for indemnity. We agree. The state is not obligated to indemnify the City of Portland for any damages, including attorney fees, that the City is required to pay the *Morgan* plaintiffs. The legislature has not, outside the context of a tort claim, authorized an indemnity action by a political subdivision against the state, and courts are not empowered to expand the legislature's chosen indemnification policies by exposing the state, in its sovereign capacity, to liabilities that it has not expressly undertaken. Accordingly, we hold that the circuit court erred in *Morgan* in granting the City of Portland's motion for summary judgment and in denying the state's motion for summary judgment on the City's cross-claim for indemnification.

## CONCLUSION

■■■ In summary, PERS is a contract between the state and its employees. *Hughes*, 314 Or at 18. The enactment of the PERS scheme in 1953 created constitutionally protected rights in PERS members. *Id.* PERS constitutes an offer by the state to its employees for a unilateral contract that may be accepted by the tender of part performance by those employees. *Id.* at 20-21. The PERS pension plan becomes vested in the state's employees on acceptance of employment.

*Id.* The six percent pick-up, guaranteed rate of return, and sick leave credit are integral terms of plaintiffs' PERS pension contracts; they also are contractual obligations of the state under plaintiffs' PERS contracts. The amount of and manner in which an employee of the state contributes to the PERS pension plan is part and parcel of that employee's PERS pension contract. It is, in essence, a binding contractual obligation as to the purchase price for the anticipated benefits to be received on completion of the employees' PERS-covered public service.

We hold that sections 10, 11, and 12 of Article IX substantially impair the state's contractual obligations to plaintiffs in violation of the federal Contracts Clause and that the impairment is not justified by any significant and legitimate public purpose. Accordingly, we declare sections 10, 11, and 12 of Article IX (Ballot Measure 8) void.

The judgments of the circuit courts in *OSPOA*, *Tissue*, and *SPEU* are affirmed. The judgment in *Morgan* on the City of Portland's cross-claim is reversed and is remanded to the circuit court for entry of a judgment for the State of Oregon on the City's cross-claim; otherwise affirmed.

## APPENDIX

Ballot Measure 8 provides:

### "AN ACT

"Be it enacted by the People of the State of Oregon:

"Paragraph 1. The Oregon Constitution is amended by creating new Sections to be added and made part of Article IX, such sections to read:

"Section 10. (1) Notwithstanding any existing State or Federal laws, an employee of the State of Oregon or any political subdivision of the state who is a member of a retirement system or plan established by law, charter or ordinance, or who will receive a retirement benefit from a system or plan offered by the state or a political subdivision of the state, must contribute to the system or plan an amount equal to six percent of their salary or gross wage.

"(2) On or after January 1, 1995, the state and political subdivisions of the state shall not thereafter contract or otherwise agree to make any payment or contribution to a retirement system or plan that would have the effect of relieving an employee, regardless of when that employee was employed, of the obligation imposed by subsection (1) of this section.

"(3) On or after January 1, 1995, the state and political subdivisions of the state shall not thereafter contract or otherwise agree to increase any salary, benefit or other compensation payable to an employee for the purpose of offsetting or compensating an employee for the obligation imposed by subsection (1) of this section.

"Section 11. (1) Neither the state nor any political subdivision of the state shall contract to guarantee any rate of interest or return on the funds in a retirement system or plan established by law, charter or ordinance for the benefit of an employee of the state or political subdivision of the state.

"Section 12. (1) Notwithstanding any existing Federal or State law, the retirement benefits of an employee of the state or any political subdivision of the state retiring on or after January 1, 1995, shall not in any way be increased as a result of or due to unused sick leave.

"Section 13.   If any part of Sections 10, 11 or 12 of this Article is held to be unconstitutional under the Federal or State Constitution, the remaining parts shall not be affected and shall remain in full force and effect."

Ballot Measure 8 was approved by the voters at the November 8, 1994, General Election, and its effective date was December 8, 1994.

**FADELEY, J.,** concurring.

I concur in the judgment and in the analysis by Justice Van Hoomissen. I write separately to detail the nature of the state's long-standing retirement system contracts and to indicate that the state constitution prevents impairing the obligations thereof, not just the federal constitution.

Individuals and the Oregon State Police Officers' Association obtained a Multnomah County Circuit Court judgment declaring that sections 10, 11, and 12 of an initiated measure violate the federal constitutional prohibition against laws that impair the obligation of contracts. US Const, Art I, § 10. Salem Police Employees and others obtained a Marion County Circuit Court judgment holding that sections 10, 11, and 12 of that measure violate the same federal constitutional prohibition. The Court of Appeals certified the state's consolidated appeal of those four trial court judgments directly to this court for decision. I would hold that the measure violates the protection against laws that impair the obligation of contracts in Article I, section 21, of the Oregon Constitution, as well as the impairment clause of the federal constitution.

## BACKGROUND

In 1989, the United States Supreme Court declared unconstitutional a Michigan tax law that taxed retirement income of federal retirees received from a federal government retirement plan but that did not tax state and local government retirees on payments they received from that state's retirement plan. *Davis v. Michigan Dept. of Treasury,* 489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989). That Court held that the constitutional doctrine of intergovernmental immunity requires equal treatment in taxation between retired former state or local government employees and retired former federal government employees. The Supreme Court held that a state's tax treatment of federal and state retirement payments must be the same. If state plan payments are exempt from state taxes, federal payments also must be exempt.

Before *Davis v. Michigan,* Oregon statutes exempted from state taxation retirement benefit payments received

from Oregon's Public Employes' Retirement System (PERS), an exemption also enacted in Oregon income tax statutes. But no similar exemption applied to federal retirement benefits. In reaction to the Supreme Court's decision in *Davis*, however, the 1989 Oregon legislature enacted Oregon Laws 1989, chapter 906, a tax on all retirement income. A referendum petition sent that tax measure to the voters, where it was defeated in the 1990 general election. That left the situation as before. State and local retirement plan benefits were exempt from the state income tax, but federal retirement payments were taxed.

This court has held that retirement system and plan statutes formed a contract when public employees provided their labor and services while the statutes were in effect. *Taylor v. Mult. Dep. Sher. Ret. Bd.*, 265 Or 445, 450, 510 P2d 339 (1973).

The 1991 legislature enacted a law repealing, among other things, the state's statutory promise that rights under PERS never would be taxed.[1] But that part of the 1991 act was declared void and a nullity because it impaired the obligation of contracts in contravention of Article I, section 21, of the Oregon Constitution. *Hughes v. State of Oregon*, 314 Or 1, 31, 838 P2d 1018 (1992).

---

[1] ORS 238.445 (*former* ORS 237.201) presently provides:

"(1) The *right* of a person *to* a pension, an annuity or a retirement allowance, to the return of contribution, the pension, annuity or retirement allowance itself, any optional benefit or death benefit, or any other *right accrued or accruing* to any person under the provisions of this chapter, and the money in the various funds created by ORS 238.660 and 238.670, *shall be exempt from* garnishment and *all state, county and municipal taxes heretofore or hereafter imposed*, except as provided under ORS chapter 118 [inheritance taxes], shall not be subject to execution, garnishment, attachment or any other process or to the operation of any bankruptcy or insolvency law heretofore or hereafter existing or enacted except for execution or other process upon a support obligation or an order of notice entered pursuant to ORS 25.060, 25.311, 25.314, 110.300 to 110.441, 419B.408 or 419C.600, and shall be unassignable.

"(2) Subsection (1) of this section does not apply to state personal income taxation of amounts paid under this chapter." (Emphasis added.)

Subsection (2) was added by the 1991 legislature in an attempt to avoid the ruling of the United States Supreme Court in *Davis*. The cross-reference to inheritance taxes in subsection (1) is interesting for two reasons: It implies that at least some benefit right is an individual property right that may pass by inheritance; Oregon has had no inheritance tax for the cross-reference to apply to for over a decade.

In *Hughes*, 314 Or at 26-27, this court held that ORS 237.201 (1989) was and had been since 1953 a "term of the PERS contract and an obligation of the state under that contract * * * by virtue of Article I, section 21, of the Oregon Constitution * * * not subject to legislative impairment without the consent of the PERS beneficiaries." The *Hughes* court limited its holding to tax-exemption rights in retirement benefits that were based on services performed before the effective date of the legislative repeal of the specific promise of exemption found in the public employees' retirement statutes. *Id.* at 29.

As explained and supported in a separate opinion in that case, I would have held that all sections of the 1991 act that repealed existing exemptions from taxation of retirement rights were laws that impaired the obligation of contracts and were similarly unconstitutional. *Id.* at 38 (Fadeley, J., concurring in part dissenting in part). That separate opinion made it clear that any repeal of the existing statutes granting a tax exemption would impair the obligation of contracts under the state and federal constitutions. The *Hughes* majority, however, went on to conclude that ORS 237.201 protected "benefits" that have accrued or are accruing for work performed before the unconstitutional attempt to repeal ORS 237.201. The *Hughes* majority concluded that the state's obligation is no greater than to pay those accrued and accruing benefits but that, as to that obligation, the constitution required that the benefits "are exempt from state and local taxation *forever*." *Id.* at 29 (emphasis added). I continue to adhere to the view that, to the extent that *Hughes* approved the taxation of PERS pension benefits for work yet to be performed, *Hughes* was wrongly decided. *Id.* at 36. On that point, it is contrary to retirement case decisions countrywide.

The *Hughes* court did not expressly decide the meaning of the words "hereafter imposed" that described the taxes from which the statutory contract exempted PERS benefits. Those words are presently found in ORS 238.445. The *Hughes* court struck down the legislature's effort to tax state and local pension benefits based on the 1945 and 1953 enactment of a tax exemption statute, without regard to the "heretofore or hereafter imposed" language. The *Hughes* court

declared the legislation removing the tax-exemption promise from the retirement statutes void and a nullity under Article I, section 21, of the Oregon Constitution, prohibiting laws that impair the obligation of contracts. My concurring in part and dissenting in part opinion in *Hughes* would have also held that the repeal of a similar exemption within the income tax statutes was likewise void and a nullity based on the same constitutional provisions and on the parallel federal constitutional provision against impairing the obligation of contracts. I continue to believe that *Hughes* was wrongly decided and that no repeal of the contractual tax exemption was permissible.

In 1993, interested persons responded to the *Hughes* decision and its state constitutional basis by filing the initiative petition for Measure 8. Qualifying for the ballot, that initiative was approved at the general election in 1994. As we shall see, the provisions of that measure further modified the state's retirement obligations. I first turn to the pertinent facts and promises of the state retirement plan as they existed before Measure 8 so that the impact of that measure may be made clear. Thereafter, a discussion of the effect of the separate provisions of Measure 8 on those facts and promises will be conducted.

### THE STATE'S RETIREMENT PROMISES

A detailed understanding of various PERS statutes, and the timing of their enactment, is necessary to our consideration of the effect and constitutionality of Measure 8.

#### 1. *Retirement Benefits Exempt from Taxation*

In 1945, the legislature established a public employees' retirement system. In 1953, the legislature enacted a mature statutory system and plan for public employee retirement. Those statutes provided that the rights to a pension would become vested after a period of successfully working for the state or local government. They expressly provided that those rights should not be subject to taxation at any level from any government in the state or its political subdivisions.

In 1969, the legislature changed and strengthened the wording concerning the statutory promise that "rights" under the plan and system would never be subject to state or

local taxes. The promise of tax exemption was not only applicable to taxes "heretofore" imposed, but was extended to cover all taxes "hereafter" imposed by state or local government. Or Laws 1969, ch 640, § 13. The 1953 tax exemption, as refined by the 1969 language, has thus continued to the present day, and is now found in ORS 238.445(1) (formerly numbered ORS 237.201), where it was placed by a reorganization and renumbering of the public employee retirement system statutes by the 1995 legislature.[2]

### 2. *Employer Pays Annuity Purchase Amounts*

As established in 1953, PERS provides benefits based on length of service and also on a separate annuity purchased during employment. The portion of the benefits based on length of service as a public employee applies a percentage factor for each year of creditable service. The employee's highest salary level for the final years of public employment is then multiplied by that factor. This portion is referred to as the "service credit portion" of retirement benefits. The employer, a state or local government unit, has paid to the PERS retirement system a percentage of all its gross wages in order to finance the service credit portion of retirement benefits.

The other portion of retirement benefits is a type of refund annuity. Sometimes called a "money-purchase" contract, the annuity is purchased with money that is paid to the system as an employee works month by month. That money paid in is invested and earns interest. Principal and interest continue to be invested, and the amount available to pay the annuity in the future grows in relation to the rate of investment return and the length of time over which interest is received and contributions of principal continue.

Initially, public employees of state and local governments paid a percentage of their individual salaries to PERS.

---

[2] The 1995 legislature also established a new class of membership within PERS. Persons who first establish membership in the system after January 1, 1996, are a separate class from those who established membership before that date. Or Laws 1995, ch 654, § 2. No person who was a member of the system before that date is included in the new class. This opinion does not consider the effect of that classification or its members' rights.

PERS uses those funds to establish and invest in the annuities of individual employees. For example, a person publicly employed during July of 1954 paid in six percent of his or her gross salary to PERS, which received the money in trust, and the money was then used by PERS to purchase an annuity for the employee in the form of a promise to pay money in the future. However, as to the employee just described, during the period of employment the source of the funds to pay for the employee's purchase of the employee's annuity was changed by an agreement between the governmental employer and the employee. That contractual agreement was statutorily authorized and was designed to save the taxpayers money.

In 1979, the legislature provided that any public employer, including the state, could contract to assume or pay the employee's contributions to the funds to purchase an annuity, contributions that the statutes previously had required to be paid to PERS by its employee members.[3] Thus, the annuity or money-purchase portion of the plan, as well as the service credit portion of the plan, could be paid for by the employer, whereas the annuity portion previously had been required to be paid for by the employee.

---

[3] ORS 238.205 (*former* ORS 237.075) provides:

"Notwithstanding any other provision of this chapter, and subject to the provisions of this section, a public employer participating in the system may agree, by a written employment policy or agreement in effect on or after July 1, 1979, to 'pick-up,' assume or pay the full amount of contributions to the fund required of all or less than all active members of the system employed by the employer. If a public employer so agrees:

"(1) The rate of contribution of each active member of the system employed by the employer who is covered by such policy or agreement shall uniformly be six percent of salary regardless of the amount of monthly salary.

"(2) The full amount of required employee contributions 'picked-up,' assumed or paid by the employer on behalf of its employees shall be considered 'salary' within the meaning of ORS 238.005(11) only for the purpose of computing a member's 'final average salary' within the meaning of ORS 238.005(15), and shall not constitute additional 'salary' or 'other advantages' within the meaning of ORS 238.005(11) for any other purpose.

"(3) The full amount of required employee contributions 'picked-up,' assumed or paid by the employer on behalf of its employees shall be added to the individual account balances of the employees for their annuities and shall be considered employee contributions for all other purposes of this chapter."

In 1979, double-digit annual inflation was present in the national economy. At that time, a very substantial increase in the number of base-pay dollars was necessary just to stay even in terms of purchasing power of every person's salary or income. Public employees, thus, could and did make a very good case for increasing their base-pay rate. However, the state also was pressed for funds. In response to reasonable requests for base-pay increase, the governor and other government leaders agreed on a money-saving plan. To increase salaries to partially keep pace with the escalating consumer price index but to do so using fewer tax dollars, the state and local governments promised to pay to PERS the money needed to purchase annuities on behalf of state and local government employees.

Prior thereto, those employees purchased the same annuities by monthly contributions to PERS made from their salaries after taxes. Previously, therefore, it had cost the employees eight to nine percent of their gross salary to buy their annuity, because they were using after-tax dollars to make the purchase. Because the state's purchase was with funds that had not been subjected to state or federal income taxes, the same amount of annuity could be purchased for six percent of wages that otherwise would have cost eight to nine percent had the state first paid the money to each employee and the employee had then paid state and local taxes on the money received and thereafter had purchased the annuity with the net. If the government bought the annuity instead of paying the base-wage increase, the government saved two to three percent of all its wage costs but the same level of annuity benefit was acquired. Under the annuity "pick-up" plan, public employees would continue to receive the lower number of base-wage dollars rather than a raise, but would receive the same value in annuity benefits as they would have received had the base rate been increased and the annuity purchase money paid by them out of net, after-tax, salary or wages.

Thereafter, in order to save taxpayer funds, a statutorily authorized contract between the government and its employees was entered. The contract required that the governmental employer pay for the individual annuity instead of the employee's purchasing it with dollars that the employee

could only use after paying taxes on them. Six percent of gross wages, paid by the employer, brought the same amount of annuity benefit as had required eight to nine percent when purchased with the after-tax net.

The government received an additional tax-saving benefit from the 1979 plan because many, if not all, payroll taxes are owed and payable by employers based on a percentage of the gross wages of their employees. By paying the annuity contribution rather than giving their employees a raise, the governmental employer saved payroll tax money because payroll taxes were paid on a lower total amount of wages. Examples of payroll percentage taxes are unemployment insurance, social security, and state workers' compensation insurance. The mutually beneficial contract has benefited the state and other participating governments by hundreds of millions of dollars in payroll savings since 1979.

When the state adopted the statute authorizing bilateral agreements for a public employee to pay—or "pick-up"—the six percent of salary that formerly was paid by the public employee to purchase a future annuity for the employee, it entered that contractual arrangement to obtain a substantial benefit for the state and, therefore, for its taxpayers, as just explained. Other public employers who entered that contractual arrangement authorized by statute also did so because of the substantial benefit that taxpayers of that level of government thereby obtained. Taxpayers were saved hundreds of millions of dollars since 1979, because the base salary of all employees remained lower because the state purchased the same amount of annuity with six percent of gross wages that would have cost eight to nine percent of gross wages of the individual employee after recognizing the reduction in spendable wages represented by taxes on such wages.

3. *Sick Leave Savings Credited to Increase Final Average Salary.*

In 1973, the legislature made provision for compensating for unused sick leave in the form of retirement benefits. The compensation took the form of adding one-half of the value of the government's savings from unused sick leave to the gross amount of salary used to determine final average

salary against which a percentage factor for the number of years of creditable service is to be multiplied. This provision is, with subsequent amendments, codified as ORS 238.350, and was formerly numbered ORS 237.153.

4. *Minimum Rate of Return Guaranteed on Annuity Investments.*

In 1975, the legislature enacted what was then numbered ORS 237.277, and has now been renumbered ORS 238.255 by the 1995 legislature as it includes an amendment by Oregon Laws 1993, chapter 177, section 31.

The 1975 legislation established that, as to the annuity purchased with the employees' contributions, an assumed interest rate of return on the money paid in would be used to provide an annual minimum floor for the rate of investment return. That assumed rate of return was set by the Public Employes' Retirement Board. If the actual earnings were less than the assumed earnings, then the law required that surplus moneys be transferred from other years where the actual earnings had been at a rate of return higher than the assumed earnings rate. The surplus thus would shore up the deficient return for the year and cause that year's earnings to meet the assumed rate of interest earnings. The "surplus" was acquired by placing earnings from years where the rate of return on investment of the employees' funds exceeded the assumed rate of return established by the Board. Under the statutory program, a rolling five-year average of investment return performance was used to establish the reserve or surplus account from which an annual deficiency was made up, thereby keeping the state's statutory promise to provide the employee annuity portion a specific assumed rate of return. Any surpluses above the assumed rate not needed to shore up deficient annual earnings were available to PERS to meet its other obligations under the plan.

The foregoing state of contract, obligation, and operation continued until 1989. PERS plan rights, whether accrued or still accruing, were tax exempt. The employer paid the dollars necessary to purchase the individual annuity portion of the retirement plan. A minimum interest rate on the annuity investment was realized and assured for each year.

Unused sick leave benefits could be saved and one-half applied to increase final years' salary used to compute the service credit portion of retirement benefits. Measure 8 erased all of those contract obligations, as we shall see by a review of that measure.

## MEASURE 8 PROVISIONS

Measure 8, the initiative measure declared invalid by the lower courts, adds three[4] separate new sections to Article IX of the Oregon Constitution, an article dealing with taxation and government finance. One section of the measure itself contains three subsections. Although one may group the different amendments under a general heading of reducing public employees' vested rights and thereby reducing government obligations arising from the state and local public employees' retirement plan, the three constitutional amendments each accomplish a different and distinct purpose. Measure 8 expressly added them to the constitution with but a single vote on all amendments lumped together. Under Measure 8, three of the new sections added to Article IX of the Oregon Constitution are:

"Section 10. (1) Notwithstanding any existing State or Federal laws, *an employee* of the State of Oregon or any political subdivision of the state who is a member of a retirement system or plan established by law, charter or ordinance, or who will receive a retirement benefit from a system or plan offered by the state or a political subdivision of the state, *must contribute* to the system or plan an amount equal to six percent of their salary or gross wage.

"2. On and after January 1, 1995, the state and political subdivisions of the state shall not thereafter contract or otherwise agree *to make any payment or contribution to a retirement system or plan that would have the effect of relieving an employee, regardless of when that employee was*

---

[4] Measure 8 added four sections to Article IX. Sections 10, 11, and 12 are the substantive sections discussed herein. Section 13 is a severability provision that has no separate meaning unless one of the substantive sections is found constitutionally wanting.

"If any part of section 10, 11 or 12 of this Article is held to be unconstitutional under the Federal or State Constitution, the remaining parts shall not be affected and shall remain in full force and effect."

*employed*, of the obligation imposed by subsection (1) of this section.

"3. On and after January 1, 1995, the state and political subdivisions of the state *shall not thereafter contract or otherwise agree to increase* any salary, benefit or other compensation payable to an employee *for the purpose of offsetting or compensating an employee for the obligation imposed by subsection (1) of this section.*

"Section 11. (1) Neither the state nor any political subdivision of the state shall *contract to guarantee any rate of interest or return on the funds* in a retirement system or plan established by law, charter or ordinance for the benefit of an employee of the state or a political subdivision of the state.

"Section 12. (1) Notwithstanding any existing Federal or State law, the *retirement benefits* of an employee of the state or any political subdivision of the state retiring on or after January 1, 1995, *shall not in any way be increased* as a result of or *due to unused sick leave*." (Emphasis added.)

## 1. *Section 10*

Subsection (1) of section 10, added to the constitution by Measure 8, enacts a special tax of six percent of salary or gross wages applicable only to public employees. Because public employees are required by law to belong to PERS, ORS 238.015 (*former* ORS 237.011), the initiated law mandates that public employees be taxed six percent of their salary. Under our statutes, all employees must belong to PERS,[5] all members of PERS must pay, and the government specifically directs the use to which the new revenue must be put. That use is one from which the government benefits, because it replaces government payments previously made from other tax funds to accomplish the identical purposes to be accomplished by the levy on all public employees' wages. Under our precedents, that is a tax.

---

[5] A public employee may escape the reach of the PERS statutes only if the employee is a member of one of the very few historically distinct public retirement systems. Even there, the recent trend has been to integrate distinct systems into PERS.

In *Automobile Club v. State of Oregon*, 314 Or 479, 485, 840 P2d 674 (1992), this court defined a tax as:

> "In the most general sense, a tax is 'any contribution imposed by government upon individuals, for the use and service of the state * * *.' Black's Law Dictionary 1457 (6th ed 1991)."

In *State Ind. Acc. Com. v. Aebi*, 177 Or 361, 369, 162 P2d 513 (1945), the court determined that the employer's contributions under the Workmen's Compensation Act are "taxes" and therefore are not discharged in the employer's bankruptcy:

> "[I]t does not destroy the character of a tax on exaction imposed by statute merely because it applied only to a certain class."

And, as this court stated 90 years ago in *Reser v. Umatilla County*, 48 Or 326, 329, 86 P 595 (1906):

> "Generally speaking, a tax is a charge or burden imposed on persons or property for the support of the government or for some specific purpose authorized by it. Its object is to raise revenue: Bouvier, Law Dic."

Under the doctrine of *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 379, 851 P2d 595 (1993), a tax is imposed on a person "if payment of the charge is a legal obligation" of that person. Further provisions of Measure 8 expressly so impose on public employee members the obligation to pay. If Measure 8 is legal, the payment is a legal obligation of each individual employee. Under Measure 8, each employee "must contribute * * * six percent of their salary or gross wage." The six percent payroll tax imposed by subsection (1) may not be repealed by the legislature, because imposition of the tax is stated in the form of constitutional amendments that affect both the employees and the state and other governmental employers. Clearly, under the foregoing authorities, the six percent payment requirement is a tax.[6]

---

[6] The 1994 General Election Voters' Pamphlet included several arguments in favor of Measure 8 that acknowledged that the measure would operate like a tax. That was presented by proponents as a factor favoring adoption of the measure.

Subsection (2) of section 10 likewise affects both governmental employers and their individual employees. It prohibits state and local government from relieving any employee from that tax by means of any contract. That restricts the freedom of contract of the state and local government and the freedom of contract of the employees. The result is that the tax may never be repealed by government or otherwise avoided by the employee. One clear effect of subsection (2) is to prevent the state from buying an annuity for the employees as a part of the employees' compensation notwithstanding the government's paid-for, statutorily based contract to the contrary.

Subsection (3) of section 10 provides that state and local government, and their employees, are prohibited from making any contract or agreement to increase compensation in order to offset the six percent tax. Likewise prohibited is any law or agreement that compensates employees in some way for the tax that they must pay. For example, reimbursing them for that tax is forbidden. While subsection (2) prevents the state from buying an annuity for the employee, subsection (3) prohibits a current raise in salary or wages under the conditions stated therein. Thus, subsection (3) performs a different function and restricts a different kind of contract both as to government and as to its employees. That is, subsection (3) also constitutionally restricts contracts but does so differently than does subsection (2). Those different provisions of section 10 restrict individuals as well as government.

2. *Section 11*

Section 11 restricts the ability of the state to enter a wholly different type of contract, one that guarantees a rate of interest or return on invested retirement trust funds where public employees are involved as the beneficiaries of the trust. This section, differing from section 10, is directed not at any compensatory relief from Measure 8's payroll tax, but at prohibiting the state from guaranteeing a specific rate of return on the annuity investments made by PERS on behalf of employees.

3. *Section 12*

Section 12 relates to unused sick leave and the service credit portion of PERS benefits. It prohibits compensating public employees for extra days of work that those employees

perform when that payment takes the form of increased investments in their retirement trust funds. Neither the service credit portion of PERS benefits nor unused sick leave compensation is the subject of either section 10 or 11, but it is the only subject of section 12. Without section 12, present law for some, but not all,[7] public employers permits the employee who has worked the extra days, rather than taking time off from work for sick leave, to receive a contribution in lieu of one-half of the pay for the extra days, as previously discussed.

Section 12 also restricts government. It prohibits the government from contracting for the additional work unless it pays for it directly at the time rather than later paying one-half of its value to the system to fund an additional service credit benefit amount for the employee who did not use allotted sick leave.

That provision relates to those who retire on or after January 1, 1995. Thus, those persons who may have worked additional days and have not used sick leave from 10, 15, or 20 years ago, relying on a contract binding at the time, are deprived of the benefit already earned by working pursuant to the obligation stated by a contract authorized by statute. Section 12 retroactively takes away all of their accrued rights under the untaken sick leave statute and agreement.[8] In addition, section 12 prevents future accrual of enhancements to that right. Their contract right to that benefit is impaired by Measure 8, which takes the valuable right from them.

Two of the separate sections, section 10(1) and section 12, expressly purport to nullify any federal law, as well as any state law, that has in the past contravened or that presently contravenes the provisions of those sections.

The foregoing provisions would cancel most, if not all, of those tax-saving provisions discussed above in "The

---

[7] For example, because sick leave credit statutes do not apply to elected judges, they are not affected by section 12.

[8] It is that provision that precipitated early retirement before January 1, 1995, of a number of administrators and law enforcement officials.

State's Retirement Promises" section of this opinion. Furthermore, those money-saving plans carried out and delivered on a statutory contract obligation of the state that pension benefits should never be taxed. The statutory contract that no state, county, or local tax shall be hereafter imposed on PERS benefits is a contract expressly in relation to:

> "The *right of a person to* a pension, *an annuity or a retirement allowance, to* the return of contribution, the pension, *annuity or retirement allowance itself,* any optional benefit or death benefit, *or any other right accrued or accruing* to any person under the provisions of [the retirement statutes], and the money in the various funds created by ORS 238.660 and 238.670 * * *." ORS 238.445(1) *(former* ORS 237.201) (emphasis added).[9]

That contractual statute has mandated and, under *Hughes,* presently mandates tax exemption not only for money benefits when paid but also for the presently accrued *"right"* to later payment of such money benefits, an accrued right that may have add-ons "accruing" to it now and in the future. The "right" to such benefits from the mandatory plan are not to be taxed by any tax "heretofore or *hereafter* imposed." Measure 8 does not merely erase the statutory contracts under which the governmental employer agreed to pay for the annuity benefit, agreed to guarantee a rate of investment return, and agreed to increase final average salary by one-half of the savings achieved through untaken sick leave. The measure also prohibits any increase in base wages and also prohibits any other compensation for the purpose of, or as a means of, offsetting that mandatory reduction in pay rate accomplished by section 10.

I next analyze the impact of Measure 8 against the foregoing statutory contracts to see whether Measure 8 unconstitutionally impairs the obligation of the government contracts. Although the lower courts ruled on the basis of the federal impairment clause and their rulings are a correct

---

[9] As can be seen from the wording of the statute, as well as the law on impairment of contracts, *Hughes* was wrongly decided, and that error someday must be corrected to conform to the protections stated in our constitutions against impairment of the obligations of governmental contracts by later-enacted laws.

application of that clause, *see* note 11 below, I start with state constitutional guarantees.

The methodology followed by this court decides a case on the basis of state law, if possible, before reaching federal law. Moreover, in this case, achieving finality now requires a state law basis for decision. Otherwise, the government can prolong the case by efforts to appeal to the United States Supreme Court.

In operation, the provisions of Measure 8 mandate that the state retain the benefit of the very contractual bargains that Measure 8 also requires the state to impair. The measure retains the lower base-wage rate that was the *quid pro quo* for the payment pick-up, the savings from untaken sick leave, and the surplus investment return on the annuity.

Measure 8 would keep for the government all benefits on its side of the bargain—lower base wages, lower payroll tax costs, and no payment in lieu of sick leave. The measure guarantees those benefits to government in the future by its placement in the constitution. But public employees lose all of the benefits they contracted to receive for which they have performed. They lose, not only all future benefit from the long-standing bargain, but also what otherwise would have been increases in base-wage rate, increases they gave up as a part of that bargain. Thus, the fundamental provisions of Measure 8 not only deprive public employees of the benefit of obligations formerly due to them on their side of the annuity and bargain but also further reduce their real wages by six percent even though, as pointed out previously, those wages were already lower because of the prior bargain on which Measure 8 would renege. The feature of canceling a contract benefit after the employees have paid for it by performance of their part of the contract is also present, in individually varying degrees, as to the unused sick leave, final years' salary, and service credit portion of retirement.

By constitutional prohibition in Measure 8, the employees are stuck with the lower base-wage rate that was based on the agreement authorized by statute in 1979 that the government would pick up, or buy for them, the annuities. Their base wages are frozen by the measure, at an

amount that is eight or nine percent lower than the base-wage rate would have been in all probability without the 1979 statute and without the bilateral contract entered into pursuant to that statute.[10] The government retains the hundreds of millions of dollars of savings already gained, and other scores of millions that it will gain in the future because of the frozen base-wage rate.

This aspect of Measure 8 expressly applies, according to the terms of that measure, "regardless of when" an employee entered public service in relation to the measure's effective date. That language indicates the intent to impair the obligation of contract on a retroactive basis. Inability of the employees to recoup for the lower base wage under the terms of Measure 8, a lower wage to which they had agreed as their part of the pay-for-annuity bargain, makes clear that Measure 8 is a retroactive law that impairs the obligation of an existing contract and, given the dollar amounts, that the impairment is substantial.[11]

Because former ORS 237.201 promised an exemption from past and future taxation on the right of a person to an annuity, not just on the final payout of that annuity, and because the state has received the consideration for its promise in the form of money-saving or tax-savings for many

---

[10] ORS 238.205 (former ORS 237.075) was adopted as Oregon Laws 1979, chapter 538, section 3.

[11] The Supreme Court of the United States in *General Motors Corp. v. Romein*, 503 US 181, 186, 112 S Ct 1105, 117 L Ed 2d 328 (1992), uses a three-question test to determine whether the constitutional prohibition against laws impairing the obligation of contracts has been violated: Whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether that impairment is substantial. Where a violation is thus established, a state may rehabilitate the constitutionality of its offending law by demonstrating a legitimate and general public purpose served by the law, such as remedying broad social or economic problems. No such showing is present in the record of the present cases, and it is conceded that no such showing can be made. *See Energy Reserves Group v. Kansas Power & Light*, 459 US 400, 411-13, 103 S Ct 697, 74 L Ed 2d 569 (1983) (under a legitimate state public purpose, some adjustment of contract rights is permissible). Although I would as a complete and adequate ground hold Measure 8 unconstitutional based on the state constitution, the trial courts relied on the federal provision. There is no question but that it is violated as well. *United States Trust Co. v. New Jersey*, 431 US 1, 97 S Ct 1505, 52 L Ed 2d 92, *reh den* 431 US 975 (1977). The state's self-interest is at stake.

years, section 10(1) of Measure 8 violates the Oregon Constitution and the federal constitution by impairing the obligation of contract. It matters not that the violation is itself accomplished by a separate, later-adopted amendment to the constitution in the form of Measure 8, section 10(1). The constitution is not so easily circumvented. Obligations may not be avoided simply by changing the constitution after they have been created and relied upon. It is the "retroaction" of effect that causes the violation. *Hughes*, 314 Or at 49 (Fadeley, J., concurring in part and dissenting in part (quoting Chief Justice John Marshall in *Ogden v. Saunders*, 25 US (12 Wheat) 212, 335-36, 6 L Ed 606 (1827), that: "The thing forbidden is retroaction.")).

On the facts stated and for the reasons stated, the provision of Measure 8 exacting a six percent levy against the wages of state and local government employees who had already been promised that an annuity would be purchased with governmental funds, and who by their work paid for that promise, may not be deprived of the obligation that the government undertook to provide that annuity. That obligation may not be impaired by a law later passed without violating the state constitution that, in Article I, section 21, provides in part:

"No * * * law impairing the obligation of contracts shall ever be passed * * *."

Section 10(1) is void and a nullity. Subsections (2) and (3) of section 10 compound the impairment of contract accomplished by subsection (1) and serve no other purpose. They are void.

The same result—substantial impairment of contract under either constitution—applies to the two other separate action sections added by Measure 8 to the constitution, sections 11 and 12. As to the guaranteed rate of investment return prohibition, it must first be noted that the state also gains substantially from the operation of ORS 238.255.[12] The

---

[12] ORS 238.255 (*former* ORS 237.277) provides:

"(1) As used in this section, 'individual account' means the individual account for each active and inactive member of the system in the Public Employes' Retirement Fund provided for under ORS 238.250, but not the individual account of the employee in the Variable Annuity Account established by ORS 238.260.

state first uses part of future surpluses to fund the rate guarantee. If there is unused surplus, as has been the case in recent periods, these funds are no longer segregated to or encumbered by fulfilling the obligation imposed by the rate guarantee promise. Instead, the state may use the surplus investment earnings for purposes of fulfilling other of the state's interests or obligations within PERS. *See, e.g.*, ORS 238.610 (system administrative expenses are to be paid from investment earnings or, if earnings are insufficient, from employer contributions).

Section 11 of Measure 8 impairs the obligation of the statutory contract by prohibiting the rate guarantee promise and plan. All of the burden of that change in the contract by the section 11 prohibition falls on the employees who, by law, must remain members of the system. The state is relieved of the obligation and receives an even greater degree of control over the trust fund investment process. Public employees experience no balancing relief from any obligation or detriment or any other *quid pro quo* to pay for the loss of the guaranteed assumed interest rate as a result of Measure 8. Besides, the literal words of the measure state that all public employees are covered by the new mandates, no matter when they commenced their service to government. That statement implies that the measure was intended retroactively to remove or erase the assumed interest rate guarantee. By that implication, section 11 thus eradicates accrued statutory contract rights, thereby unconstitutionally impairing the obligation of contract under each constitution.

---

"(2) The individual account for an active or inactive member of the system shall be examined each year. If the individual account is credited with earnings for the previous year in an amount less than the earnings that would have been credited pursuant to the assumed interest rate for that year determined by the board, the amount of the difference shall be credited to the individual account and charged to a reserve account in the fund established for the purpose. A reserve account so established may not be maintained on a deficiency basis for a period of more than five years. Earnings in excess of the assumed interest rate for years following the year for which a charge is made to the reserve account shall first be applied to reduce or eliminate the amount of a deficiency."

The section remains as originally enacted by Oregon Laws 1975, chapter 333, section 2, except that Oregon Laws 1993, chapter 177, section 31, clarified that an individual account is to be maintained for all members, including inactive members.

Application of one-half of the value of unused sick leave to increase final salary and thus increase the portion of benefits predicated on service years is impacted differently than the annuity portion benefits. As to the increase of final years' salary to compensate for one-half of unused sick leave, the effect of the provisions of Measure 8 prohibiting the sick leave contract from being carried out is to cancel part of all employees' retirement benefits, even though already earned by the employee who has already performed her or his side of the contract by not using sick leave.[13] The cancellation is retroactive because it is after the fact and after the employee has performed the employee's part of the agreement. Thus, after the employee has given the required consideration to the state to pay for the state's return promise, Measure 8 irrevocably would cancel and void that return promise. The measure impairs the obligation of that contract by canceling the obligation to perform the already paid-for return promise. *Hughes*, 314 Or at 43 (Fadeley, J., concurring in part and dissenting in part); *Taylor*, 265 Or at 450-51; *Crawford v. Teachers' Ret. Fund Ass'n*, 164 Or 77, 99 P2d 729 (1940) (teacher who had completed the prerequisite duty entitling her to a pension had a vested contract right thereto which could not thereafter be substantially impaired).

Measure 8 thus impairs both major parts of the statutory system for calculating retirement benefit amounts, the annuity and the service credit portion. The impairment is imposed after those benefit-calculation provisions became vested rights as to almost all state and local government employees, including school district employees.

Sections 11 and 12 are void under the state constitution, because they impair the obligation of contract in the form of the state's promises mandated or authorized by statute and from which the state has realized and retains benefits conferred by its employees, who in turn have conferred those benefits in reliance on the contract provisions that Measure 8 impairs.

---

[13] That is, all except for employees who were able to and did retire before January 1, 1995, before cancellation of the earned right to sick leave credit, and except for the judiciary who have not been accorded sick leave benefits and, thus, have accumulated none to apply to increase final years' salary.

Measure 8 is void and a nullity. The state and local governments remain bound by their contracts and must now disgorge funds taken from employees unconstitutionally under Measure 8.

**GILLETTE, J.,** specially concurring in part and dissenting in part.

These consolidated cases arise out of various constitutional challenges that have been mounted against the substantive provisions of Ballot Measure 8, which the voters approved at the November 8, 1994, general election. That ballot measure added three new sections—10, 11, and 12—to Article IX of the Oregon Constitution. Section 10 requires (1) that all public employees contribute 6 percent of their salary to their retirement pension system, (2) that the public employer not contribute to the same system in a way that would relieve the required employee contribution, and (3) that the public employer not otherwise offset the required employee contribution. Section 11 forbids any public employer from guaranteeing a rate of return or interest on a pension fund. Section 12 directs that, with respect to any public employee retiring on or after January 1, 1995, retirement benefits not be increased by any amount attributable to unused sick leave.

The issue brought to us in these combined cases is: Do any of the above provisions violate the Contracts Clause of the United States Constitution?[1] The lead opinion concludes that all three substantive sections of the Ballot Measure offend the Contracts Clause. For the reasons that follow, I reject the analysis that is the basis of that conclusion, because I believe that the analysis ignores the rules that this court heretofore has set for itself in cases of this kind. As I also shall explain, however, I agree that sections 11 and 12 are invalid, based on well-settled rules concerning the impairment of contracts. I dissent from the lead opinion's invalidation of section 10.

---

[1] Article I, section 10, of the United States Constitution provides:

"No state shall * * * pass any * * * Law impairing the Obligation of Contracts[.]"

I begin with a general observation about the present Oregon statutory arrangement concerning public employees' pensions. ORS chapter 273 contains a contract that provides, *inter alia*, that public employees will receive a pension for the work that they have performed. *See, e.g., Hughes v. State of Oregon*, 314 Or 1, 17-21, 838 P2d 1018 (1992) (so holding). But not *every* statutory provision in ORS chapter 237 is a part of that contract. Instead, whether a particular provision is part of that contract is a question of legislative intent. *Id.* I turn to a consideration of the provision involved in this case.

Under the PERS statutes, both public employers *and employees* have been required since 1953 to contribute to the pension fund.[2] *Former* ORS 237.071.[3] The lead opinion mentions the foregoing obligation, but fails to appreciate its significance. The statute now provides in part:

> "*Each employee* who is an active member of the system *shall contribute to the fund* and there shall be withheld from salary of the employee *six percent of* that *salary*."

(Emphasis added.) In 1979, the legislature added *former* ORS 237.075.[4] That statute now provides in part:

> "Notwithstanding any other provision of this chapter, and subject to the provisions of ORS 237.001 to 237.315, a public employer participating in the system *may agree, by a written employment policy or agreement in effect on or after July 1, 1979,* to 'pick-up,' assume or pay the full amount of contributions to the fund required of all or less than all

---

[2] PERS is the relevant pension system for the majority of plaintiffs in the present litigation. However, one group of plaintiffs is not part of PERS but, instead, belongs to the Portland Fire and Police Disability and Retirement Plan (FPD&R). Because this dissenting opinion is aimed primarily at what I believe to be lapses in the lead opinion's analysis, and because that opinion never discusses the unique application of section 10 to the FPD&R, I do not discuss the FPD&R further in this opinion.

[3] In 1979, *former* ORS 237.071 provided for several contribution rates, ranging from four to seven percent of salary. In 1981, the statute was amended to provide a blanket six percent rate for all employees, except for those who became members of the system before August 22, 1981, and were entitled to a lower contribution rate at that time. *Former* ORS 237.071 was renumbered ORS 238.200 in 1995. No substantive change was made at that time.

[4] In 1993, the statute was amended to replace "employee member" with "active member." ORS 237.075 was renumbered ORS 238.205 in 1995. No substantive change was made to its provisions.

active members of the system employed by the employer. If a public employer so agrees:

"(1) The rate of contribution of each active member of the system employed by the employer who is covered by such policy or agreement shall uniformly be six percent of salary regardless of the amount of monthly salary."

(Emphasis added.) The meaning of *former* ORS 237.075 is central to this case.

As the statutory context demonstrates, the rule before 1979 was that a public employee was *required* to pay a 6 percent contribution to the retirement system. Then, in 1979, the legislature saw fit to relax the foregoing requirement by enacting *former* ORS 237.075. Under that statute, a public employer was authorized *in its discretion* in the course of the collective bargaining process, or otherwise, to agree to a pick-up of its employees' contribution; it was *not required to agree* to such a pick-up.

Subsequently, many public employers entered into collective bargaining agreements to pay the pick-up in lieu of raising employees' wages. Invariably, the pick-up was limited to the life of the collective bargaining agreements, but it has continued to be negotiated into successive two-year agreements. Non-union employees typically were extended the same pick-up arrangement through informal policy or practice.

The effect of the enactment of section 10 thus was to place in the Oregon Constitution a specific constitutional requirement that mirrored the pertinent part of *former* ORS 237.071, while prohibiting the practice that had been permitted since 1979 by *former* ORS 237.075. Plaintiffs' theory is that, as a matter of traditional pension law, once the 6 percent pick-up was extended to employees, it became a permanently vested right of those employees that could not be taken away, even with respect to future employment and the benefits that were solely the reflection of such future employment, without providing offsetting benefits. Plaintiffs further argue that, although the provisions in various collective bargaining agreements by definition extended the right to the pick-up only over the two-year life of those underlying labor

agreements, the periodic expiration of that right did not prevent it from being permanent. Therefore, plaintiffs argue, section 10 impermissibly impaired their PERS contract, by eliminating an existing contractual pension right to the 6 percent pick-up. In other words, plaintiffs seek to transform what is, *at best*, an express contractual right of *limited duration* into an implied absolute contractual right by virtue of traditional pension law. The lead opinion performs that transformation.

There can be no question as to the governing law in this case. Oregon follows the contract theory of pension benefits, *i.e.*, it treats pensions as a deferred portion of the contracted-for compensation earned by public employees. *See, e.g., Hughes*, 314 at 17-21 (summarizing law and citing cases). Thus, the problem here is not whether there is a contract—there is one: the PERS system. Apparently, that is enough for the majority.

But our methodology until today was far more demanding. The appropriate inquiry, under our precedents, should proceed in three steps: (1) Was the statute in question a part of the contract? (2) If so, what was the specific nature of the promise made by that statute? (3) Whatever the promise contained in the statute, what was its duration? In order to prevail here, the plaintiffs must demonstrate (1) that the statute in question, ORS 237.075, was a part of the PERS contract; (2) that the statute promised that the six percent pick-up that it discusses would be a part of an employee's pension program under PERS, once that employee's employer agreed to the pick-up; and (3) that that promise was in perpetuity, *i.e.*, was not subject to modification at a later time.

The lead opinion concludes that the contract does contain a promise, one that is broad enough to meet plaintiffs' desires. But that opinion does so only by ignoring the cardinal principle that this court long ago created to assure that legislative enactments would be deemed to be contracts only in those circumstances in which the legislature intended them to be such. This court most recently reiterated that principle in *Hughes*:[5]

---

[5] Of course, *Hughes* is distinguishable factually. But that case plowed no new ground. It was a simple compilation of rules derived from our earlier precedents.

"[I]n determining whether a contract exists, because this case involves state legislation alleged to be a contract, *a contract will not be inferred from that legislation unless it unambiguously expresses an intention to create a contract. Eckles v. State of Oregon,* [306 Or 380, 390-91, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032 (1989)]; *Campbell v. Aldrich,* [159 Or 208, 213-14, 79 P2d 257, *appeal dismissed* 305 US 559 (1938)]."

314 Or at 17. (Emphasis added.) And, even if a contract is proved—as it has been in this case—it is necessary to inquire further to determine whether a particular statute was a part of that contract. 314 Or at 21, 23. Finally, the precise nature and extent of the particular statutory promise must be identified. *See* 314 Or at 27-29 (illustrating process).

The "intention" that the *Hughes, Eckles,* and *Campbell* decisions all require is a *legislative* intention, expressed in the particular statutory provision that a party asserts is a part of the contract that the party has with the government. *See Hughes,* 314 Or at 22-27 (demonstrating the method by which the court looks to determine whether a specific statute was intended by the legislature to be a promise). Under familiar principles of statutory construction, the intention of the legislature in enacting a statute is to be determined, first, by examining the wording of the statute, together with the statutory context in which the statute appears. *PGE v. Bureau of Labor & Industries,* 317 Or 606, 610-11, 859 P2d 1143 (1993). Thus, if the legislature is to be said to have intended that the 6 percent pick-up authorized in *former* ORS 237.075 be a promise in perpetuity to public employees, that intention must be found *in that statute.* The lead opinion never even acknowledges the foregoing methodology, much less attempts to follow it.[6]

Thus, my frequent citations to it are a shorthand to all of our precedents on this topic, of which *Hughes* is the compendium.

[6] The lead opinion's failure to appreciate the reason for this elementary tenet is manifested, *inter alia,* by its reliance on numerous cases from other jurisdictions that conclude that an increase in required employee contributions to a pension plan impaired a contractual obligation. Invariably in those cases, the state legislature created *by statute* a certain contribution requirement and then subsequently *by statute* increased that amount. Here, the statutorily required rate of contribution (six percent, as set in *former* ORS 237.071) has not been altered. The six percent pick-up promise was negotiated between employers and employees; it never was created by statute. Even assuming, as the lead opinion apparently does, that

I shall assume, for the purposes of this opinion, that plaintiffs can overcome the first hurdle, *i.e.*, can show that ORS 237.075 is a part of the PERS contract. But, as I shall show, plaintiffs cannot get past the second hurdle, *i.e.*, they cannot demonstrate that the promise made by ORS 237.075 is as extensive as it needs to be in order for them to prevail.

I already have reviewed the relevant statutory text and context above and need not set that review out again at length here. A fair summary is that there is a general statutory rule that a public employee must contribute 6 percent of the employee's salary toward the employee's pension, *former* ORS 237.071, but that an employer may make an exception to the general rule if it wishes by agreeing, either formally (in a collective bargaining agreement) or informally (with respect to unrepresented employees), that it will "pick up" the employee's 6 percent obligation. *Former* ORS 237.075. Where, in the wording of that latter statute, is there any room for a plausible interpretation that transforms the aforementioned statutory *permission* into a *promise* to pick up all public employees' 6-percent contribution? Nowhere. And, because there is no such plausible construction of statutory text and context, the statute simply may not be read to do what the plaintiffs (and the lead opinion) wish to have it do. *PGE*, 317 Or at 610-11 (citing to ORS 174.010 for the rule of statutory construction that a court is "not to insert what has been omitted").

The lead opinion devotes an enormous amount of its energy to proving, through an exhaustive review of our precedents, that it is *possible* for the legislature to promise benefits to public employees that continue to be available into the future. However, nobody here questions the *power* of the legislature to make a promise to public employees in perpetuity; this court specifically recognized in *Hughes* that such a promise would be possible. 314 Or at 28. But establishing that the legislature has the *power* to do a thing does not, *ipso facto*, mean that the thing *has been done.*

---

the pick-up promise in the collective bargaining agreement became part of the statutory promise, the express two-year durational limitation of those agreements necessarily kept the promise from becoming permanent.

The lead opinion gets as far as it does only by pretending that the PERS statutory scheme is monolithic, with each provision of it being a part of a single promise. However, our earlier precedents demand (and *Hughes* illustrates) that each statutory provision must be examined on its own terms to determine legislative intent and that this is true particularly of later-enacted statutory provisions like *former* ORS 237.075. *Hughes*, 314 Or at 22-29.

Why the lead opinion has strayed so far from the appropriate methodology in this case is hard to fathom, although it does offer some hints. It states, for instance 323 Or at 373:

"The enactment of [*former*] ORS 237.075 followed lengthy negotiations between the state and employee unions, during which employees agreed to forego a requested pay raise in exchange for a right to bargain with public employers for a six percent 'pick-up.' The enactment allowed the state to give employees what amounted to a six percent pay increase without increasing the state's payments to Social Security. The agreement also had significant tax benefits for the employees.

"If the state stops paying the six percent pick-up and that cost is shifted to plaintiffs, the state will reduce its PERS costs by six percent of salary. Because plaintiffs will have to pay PERS six percent of their salary, they will experience slightly more than a six percent reduction in their salaries, because pick-up amounts are not considered as income and are not taxed when contributed, whereas employees pay their contributions from their taxable income."

(Footnote omitted.)

So what? Those statements in the lead opinion are not a part of any relevant analysis. If anything, they are expressions of concern over the consequences of the policy choice made by the people in adopting Ballot Measure 8. It may well be true, as the lead opinion's musings imply, that Measure 8 represents public policy that is wrong-headed, short-sighted, and mean-spirited. But if any or all of those characteristics qualify legislation for invalidation by this court, our work has changed utterly from that which the

Oregon Constitution and the laws made pursuant to it allocate to us.

The lead opinion further weighs in with a justification for its actions that is a flat misstatement: "That consequence [of allowing Section 10 to stand] would permit the state to retain the benefit of plaintiffs' labor, but relieve the state of the burden of paying plaintiffs what it promised for that labor." 323 Or 374. That argument is specious. *The state never has claimed that any of the substantive sections of Ballot Measure 8 should be applied retroactively, thereby depriving any public employee of any benefit that the employee already has worked for.* With respect to any pension fund contributions made on their behalf up to the effective date of Ballot Measure 8, plaintiffs have lost nothing. That money is not withdrawn; it continues to draw interest and will be available, when they retire, as benefits. They have lost the 6 percent pick-up *prospectively*—but they never were promised anything to the contrary.

In summary, I find the lead opinion's approach to and resolution of the challenge to section 10 to be at odds with the most fundamental principles that this court heretofore has applied to impairment-of-contract claims involving state statutes. Instead of observing the procedures that this court has established in such cases, the lead opinion speaks as if it has set itself up to judge the social utility and acceptability of a measure that the people have chosen to adopt. That is an inappropriate use of the judicial power.[7] I would hold that section 10 does not violate the Contracts Clause.

The lead opinion also strikes down section 11, the guaranteed rate of return section, and section 12, the sick leave provision. As to each, the lead opinion utilizes an analysis similar to that used to invalidate section 10. As I have explained, I disagree with the lead opinion's entire approach to the problem. However, my disagreement does not extend

---

[7] The inappropriate role assumed by the lead opinion is highlighted by that opinion's assertion that "notions of fundamental fairness that transcend the [Contract Clause] itself" dictate the conclusion that the lead opinion reaches. 323 Or at 375. That novel approach never has been a part of this court's (or any court's) jurisprudence. Our role is to *apply* the Contract Clause, not to "transcend" it in some quixotic effort to arrive at what some members of the court deem to be "fundamentally fair."

to the lead opinion's holding as to either section. The lead opinion reads both sections as applying retrospectively, *i.e.,* as affecting rights for which public employees already have performed the requisite labor. I agree that those sections fairly may be read that way and, as so read, are impermissible impairments of contract. *See, e.g., Hughes*, 314 Or at 31 (retrospective abrogation of tax exemption for pensions was impairment of PERS contract); *Harryman v. Roseburg Fire District*, 244 Or 631, 634-35, 420 P2d 51 (1966) (invalidating retrospective application of a decision by a fire district that terminated an accrued sick leave rule). I therefore concur specially as to those two sections.[8]

If we were charged in this case with writing on a clean slate concerning the subject matter addressed by section 10, I might well set policy in line with that which results from the lead opinion. But the policy choice in this area is entrusted to another branch of government—the people, exercising their legislative power under Article IV, section 1, of the Oregon Constitution. The lead opinion oversteps the proper scope of our authority to overrule that policy choice. In so doing, the lead opinion suffers, not from any want of good will or of diligence, but from a temporary loss of perspective, apparently due to the subject matter—pensions—that we are addressing. I cannot join it.

Carson, C. J., and Graber, J., join in this specially concurring and dissenting opinion.

---

[8] As I read it, the lead opinion would not allow *prospective* application of sections 11 and 12, either, at least with respect to public employees who already were on the job when Ballot Measure 8 went into effect. In my view, that is error, for the same reasons that the ruling on section 10 is (in my view) error. But that error does not affect the disposition of this case as to sections 11 and 12.