BREWER, J.,
concurring.
Although I concur in the majority’s analysis and conclusions, I write separately to emphasize what I believe to be the proper framework for the statutory contract interpretation analysis in claims under Article I, section 21, of the Oregon Constitution, where the legislature has made statutory changes to retirement benefits for members of the Public Employees Retirement System (PERS). I will confine my attention to two central determinations under that analysis: First, what standards apply for identifying terms of the PERS contract; and second, what obligations do those terms provide? Because they present the more challenging issues in this case, I focus exclusively on the disputed COLA benefits.
When the PERS system is the subject of judicial scrutiny, this court’s role is neither policy-setting nor managerial. Our responsibility is to interpret legislative enactments and the Oregon and United States Constitutions and to apply those sources of law to the circumstances presented in specific cases. To a significant extent, the strength of Oregon’s public pension system rests on policy choices made by the other two branches of government and on their political will to satisfy prior legislative commitments to active members, retirees, and public employers. That said, because of mixed and sometimes unclear messages that this court has conveyed in some of its prior decisions, we bear a measure of responsibility for the uncertainty that the other branches have faced when, from time to time, they have reexamined the benefit structure of the PERS system. What the court can do in this case, within the inherent limitations *237 of the adversary system, is provide more clear guidance with respect to the governing legal principles. I commend the majority for undertaking to do so.
With that acknowledgement, I turn to the question of what standards apply for identifying terms of the PERS contract. The majority describes an overarching standard for identifying the terms of that contract in terms of “unmis-takability.” See 357 Or at 195 (citing Hughes v. State of Oregon, 314 Or 1, 14, 838 P2d 1018 (1992) (a government contract will not be inferred from legislation that does not unambiguously express an intention to create one)); see also Eckles v. State of Oregon, 306 Or 380, 397-99, 760 P2d 846 (1988), appeal dismissed, 490 US 1032, 109 S Ct 1928, 104 L Ed 2d 400 (1989) (same).[1] The majority further concludes that determining whether a particular legislative assembly unmistakably intended for a benefit to be a term of the PERS contract requires an examination of statutory text and context. 357 Or at 203. It then sets out two guiding principles for making the determination: (1) whether the state’s offer is limited to provisions that define eligibility for or the scope of remunerative pension benefits, id. at 204; and (2) only mandatory remunerative provisions are terms of the state’s offer, id. at 205. The majority then ultimately concludes that the COLA cap and COLA bank provisions set out in ORS 238.360(2) and (3) (2011) are contractual promises because both provisions confer remunerative benefits and both con-ferrals are expressed in mandatory terms. Id. at 214-19. In determining that the COLA bank and COLA cap are remunerative benefits, the majority focuses on the fact that those benefits are incorporated into the statutory formula used to determine a member’s service retirement allowance and that they are funded through current employer contributions, not employee contributions or investment returns. Id. at 216-17.
That formulation of the test — as the court has applied it in this case and others — strikes me as being more of a traditional statutory construction analysis than a *238 true application of an unmistakability principle. It is traditional, but with a twist, in that it appears to set out a near-presumption that any remunerative pension benefit that is provided in mandatory statutory terms will be treated as part of the PERS contract. To be sure, the majority refers to statutory context, but it focuses primarily on the mandatory and remunerative aspects of the statutory text in arriving at its conclusion.
There is inherent tension in an approach that nods at unmistakability but actually seems to require something else. Undoubtedly, there are instances in which an enacting legislature has conferred a remunerative pension benefit in mandatory terms without fully considering the impact of that decision on the authority of future legislatures.[2] Moreover, this court employs a looser standard than unmistakability when identifying the terms of a pension contract that an employee accepts by entering into public employment. Specifically, this court has consistently held that a public pension plan is an offer for a unilateral contract that can be accepted by the tender of part performance by the employee, even without the employee’s reliance on the employer’s promise to provide particular benefits. Hughes, 314 Or at 20-21; Taylor v. Mult. Dep. Sher. Ret. Bd., 265 Or 445, 451-52, 510 P2d 339 (1973) (holding that an employee had a right to retirement benefits even though the public employee “did not undertake employment *** with the expectation that she would be entitled” to the benefits and did not “continue!] her employment *** upon the expectation [that] she would receive the advantageous pension authorized” by the employer).
In short, despite its adherence to the principle of unmistakable intent, the majority has followed an approach that primarily focuses on the two questions described above: (1) does the statute confer a remunerative benefit; and (2) is that conferral expressed in mandatory terms? Because the answer to both questions in this case is yes, the majority *239 concludes that the disputed COLA benefits are terms of the PERS contract.
None of this should come as a surprise in light of this court’s construction of ORS 238.360(1) (2001) in Strunk v. PERB, 338 Or 145, 108 P3d 1058 (2005). In fact, unless the court were to overrule Strunk, any conclusion other than the one that the majority reaches would be difficult to explain. Although some tensions persist in the court’s analytical framework for identifying terms of the PERS contract, I agree with the majority that defendants have not shown that this court’s decision in Strunk should be disavowed. To the contrary, because, as elaborated below, a mandatory remunerative benefit generally is nonforfeitable once earned through the performance of work, this court’s conclusion that the COLA benefit at issue in Strunk was a term of the PERS contract was correct.
Things get more complicated when the majority answers the next question about ORS 238.360(2) and (3) (2011), that is, what obligations did those subsections provide? As that question is posed in this case, the issue is whether the disputed COLA benefits are modifiable and, if so, to what extent? In answering that question, the majority likens those benefits to the repealed tax exemption at issue in Hughes. According to the majority,
“in this case, by the time that the legislature enacted SB 822 and SB 861, modifying the pre-amendment COLA provisions, PERS members already had a contractual right to their accrued retirement benefits that would be subject to the pre-amendment COLA. Hughes, therefore, establishes a contractual obligation applicable in this case: Members are entitled to have the pre-amendment COLA applied to accrued PERS benefits earned before the COLA amendments went into effect.”
357 Or at 220. Thus, the majority concludes that COLA benefits that accrued before the amendments went into effect are not modifiable. In determining whether the disputed benefits are prospectively modifiable, the majority sets out two guidelines: (1) mandatory language is insufficient to establish nonmodifiability, id. at 225-26; and (2) “legislatures generally do not intend to bind future legislatures,” id. at 226. The *240 majority ultimately concludes “that the COLA provisions do not include a promise to apply any specific COLA to increase retirement benefits for work that is yet to be performed.” Id.
Note the juxtaposition here between the analyses of whether the COLA benefits are terms of the PERS contract and whether and to what extent they are prospectively nonmodifiable benefits. In answering the first question, the majority concludes that legislative use of mandatory language is critical, whereas, in answering the second, it states that the use of such language, “without more, is plainly insufficient to establish the irrevocability of an offer.” Id. In other words, the majority holds that mandatory language is a strong indication that a remunerative benefit is contractual, but not that a remunerative benefit is prospectively nonmodifiable. That distinction is not necessarily an obvious one. Yet, it has some force.
The pivotal inquiry in deciding whether and to what extent a PERS benefit is prospectively modifiable is one of legislative intent. However, this court has not been consistent in assigning significance to a determination of actual legislative intent in the modifiability analysis. In Oregon State Police Officers’ Assn. v. State of Oregon, 323 Or 356, 375-76, 918 P2d 765 (1996) (OSPOA), for example, the court held — without engaging in a traditional statutory construction analysis — that PERS members irrevocably were entitled to the employer “pick-up” benefit of the statutory contract upon their initial acceptance of employment. Id. at 376 (because “[t]he six percent pick-up is an integral part of the underlying PERS pension contract,” its unilateral termination “materially changes that underlying pension contract to plaintiffs’ detriment and, thus, frustrates plaintiffs’ reasonable reliance on the offer the state made to them and which they accepted by the tender of part performance”). In Hughes and Strunk, on the other hand, the court examined each pertinent statutory provision in detail to determine the existence and extent of a legislative promise not to modify remunerative benefits. I agree with the majority that it is virtually impossible to reconcile those distinct approaches.
To resolve the tension in this court’s decisions, it is essential to clarify both the role of the text and context *241 of a statutory promise and the role of general employment contract principles in determining the prospective modifi-ability of a PERS benefit. In Hughes, the relevant statutory text drew a line between benefits that had accrued or were accruing and those that had not yet accrued. See 314 Or at 7. That factor played an important role in the court’s analysis. Id. at 20, 27-28. However, in resolving the plaintiffs’ claim, this court did not rely solely on that text or its statutory context. In addition, it referred to contract principles that it purported to draw, in part, from an Oregon Attorney General’s opinion:
“Oregon’s Attorney General articulated this contractual nature of pension benefits as follows:
“‘Employe [e] pension plans, whether established by law or contract, create a contractually based vested property interest which may not be terminated by the employer, except prospectively. The employer offers payment of future pension benefits as part of compensation for work currently performed. Employe [e]s accept and earn such future benefits by performing current labor.’ 38 Op Att’y Gen 1356, 1365 (1977) [.]”
Hughes, 314 Or at 20-21 (emphasis in Hughes).
Interestingly, the authority that the Attorney General cited for the quoted proposition was drawn from this court’s decision in Taylor, 265 Or at 454:
“As applied to the present circumstances, [the] plaintiff’s tender of the contributions and acceptance of the plan terminated [the] defendants’ power to revoke the offer, and [the] plaintiff would be entitled to the benefits of the plan if she continued to work for the requisite period necessary for retirement.”
That conclusion does not support the proposition for which the court in Hughes cited the Attorney General’s opinion.[3] *242 However, there is other authority from this court that does support the principle of prospective modifiability set out in Hughes.
In the absence of an agreement to the contrary, an employer generally has the right to modify employment benefits — if they have not been earned by previous service. State ex rel Roberts v. Public Finance Co., 294 Or 713, 716-19, 662 P2d 330 (1983). And, an employee ordinarily impliedly accepts a modification in the terms of employment by continuing employment after the modification takes effect. Mail-Well Envelope Co. v. Saley, 262 Or 143, 152, 497 P2d 364 (1972); Page v. Kay Woolen Mill Co., 168 Or 434, 439, 123 P2d 982 (1942). In short, employment benefits that are accredited and accumulate as service is performed generally are prospectively modifiable unless the employer’s promise is more durable.
This court somewhat regularly — if not consistently— has applied that general employment contract principle in the public employment benefit setting. In Harryman v. Roseburg Fire Dist., 244 Or 631, 420 P2d 51 (1966), for example, the defendant employer adopted a sick leave policy that provided for cash in lieu of accumulated sick leave upon termination from employment. The plaintiff employee had accumulated 47 days of sick leave when the employer revoked the policy. Sometime after that revocation, the employee was terminated. When the employee requested the cash in lieu of his accumulated 47 days of sick leave, the employer refused, contending, among other things, that it *243 was not obligated to pay because the sick leave policy had been revoked before the employee’s termination. This court held that the employer could not escape its obligation to comply with its promise to pay sick leave:
“When plaintiff entered upon his employment with defendant he was advised that he would receive an allowance for accumulated sick leave upon termination of employment. He accepted employment upon the assumption that the allowance for sick leave was a part of his compensation for services. Since it was a part of the inducement to accept employment, it can be regarded as a contractual term of plaintiffs employment. Defendant could not, therefore, deprive plaintiff of the allowance after he had earned it.”
Id. at 634-35 (footnote omitted; emphasis added).
Later, in Strunk, this court rejected the petitioners’ argument that their rights to certain retirement benefits became irrevocable when they began employment:
“In their reply brief, petitioners also argue that this court’s decision in [Taylor] ‘is a much more pivotal case in this court’s developing analysis of pension benefits than is OSPOA.’ In Taylor, which involved a county retirement system, the court acknowledged that ‘contractual rights can arise prior to the completion of the service necessary to a pension.’ 265 Or at 451. Of course they can. The predicate question- — -which we determine to be dispositive in these cases — is whether the contract offer that the particular pension plan presents contains such a promise, i.e., a promise that extends over the life of a covered member’s service.”
338 Or at 192 n 40 (emphasis omitted). Thus, this court has applied — in public employment benefit settings generally and in determining the nature and extent of obligations included in the statutory PERS contract — the contract principle that remunerative benefits that are earned and accumulate as service is performed are prospectively modifiable unless the employer’s initial offer of employment included a different promise, for example, a promise that extends over the life of the employee’s service.[4]
*244 As can be seen from the foregoing discussion, identifying the nature and extent of an obligation of the PERS contract requires the application of statutory construction principles because PERS is a legislative contract. That inquiry also involves the application of employment contract principles, to the extent that a statutory construction analysis does not fully identify the nature and extent of the parties’ rights and obligations. The beginning place, though, is the statute itself. See Arken v. City of Portland, 351 Or 113, 139, 263 P3d 975 (2011), adh’d to on recons sub nom Robinson v. Public Employees Retirement Board, 351 Or 404, 268 P3d 567 (2011) (so holding).
To set the stage for the application of those principles to the COLA benefits in this case, there must be a common understanding of three key concepts: first, what it means for a PERS member to be “vested”; second, how benefits are earned; and third, what it means for earned benefits to “accrue.” The answers to each of those questions will vary depending on the terms of the contract and the nature of the promised benefit.
As used in the PERS statutes, “vest” is a term that refers to a member’s irrevocable eligibility to receive benefits. For Tier One and Tier Two employees, “vested means being an active member of the system in each of five calendar years.” ORS 238.005(30).[5] A member who is not vested can suffer a forfeiture of benefits if the conditions for eligibility *245 are not fulfilled. Thus, for example, ORS 238.095(2) provides, generally speaking, that “an inactive member ceases to be a member of the system if the member is not vested and is inactive for a period of five consecutive years.” On the other hand, if an inactive member
“who is a vested member of the system and who has not attained earliest service retirement age is separated, for any reason other than death or disability, from all service entitling the employee to membership in the system, the member account, if any, of the member shall remain to the member’s credit in the fund unless the member elects to withdraw it and there shall be paid such death benefits as this chapter provides; or a disability retirement allowance or, after attaining earliest service retirement age, a service retirement allowance, either of which shall consist of the allowance provided in ORS 238.300, but actuarially reduced based on the member’s then attained age.”
ORS 238.425. Thus, the statutory meaning of “vest” in the PERS system refers to a member’s irrevocable eligibility to receive retirement benefits. That meaning is consistent with the concept of vesting as this court described it in McHorse v. Portland General Electric, 268 Or 323, 331, 521 P2d 315 (1974):
“[I]t would seem that in the situation where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, the better reasoned view is that the employee has a vested right to the benefits. This view sees the employer’s plan as an offer to the employee which can be accepted by the employee’s continued employment, and such employment constitutes the underlying consideration for the promise.”
Vesting must be distinguished from the earning of benefits. To “earn” means “to receive as equitable return for work done or services rendered” or to “have accredited to one as remuneration.” Webster’s Third New Int’l Dictionary 714 (unabridged ed 2002). To “remunerate” means to “pay an *246 equivalent for” or to “compensate.” Id. at 1921. Thus, to say that a member is vested in the PERS system does not determine the amount of benefits that a member has earned— either at retirement or upon earlier termination of membership in the system — as compensation for services rendered. That determination depends on how and the extent to which the benefits have been accredited to a member over time, that is, to what extent the benefits have “accrued.” See id. at 13 (defining “accrue” as “to be periodically accumulated in the process of time”). In most employment relationships, including in the PERS system, an employee receives credit for and accumulates compensation and other remunerative benefits based on the incremental performance of service. Thus, ordinarily, a vested PERS member will earn and accrue more benefits the longer he or she works.
Unfortunately, this court in OSPOA did not carefully distinguish among the concepts of vesting and the earning and accrual of benefits, when, among other things, it said:
“Most jurisdictions adhering to a contract theory of pensions construe pension rights to vest on acceptance of employment or after a probationary period, with vesting encompassing not only work performed but also work that has not yet begun.”
323 Or at 371. Vesting generally does not encompass “work that has not yet begun” in the sense that it necessarily entitles a member to earn benefits by performing future work. Rather, as discussed, vesting refers to a PERS member’s irrevocable eligibility to receive benefits under the terms of the statutory contract. And, also as discussed above, in the absence of a promise to provide a benefit that extends over the life of a covered member’s service, the legislature prospectively may modify a PERS benefit if it has not yet been earned.
With those principles in mind, I turn to the question of whether defendants’ promises to provide the COLA cap and COLA bank benefits extend over the life of plaintiffs’ service and, therefore, are nonmodifiable. As will be shown, the statutory text and context of ORS 238.360(2) and (3) (2011) describe how the disputed COLA benefits are *247 earned and accrued, but they contain no promise of prospective irrevocability. Under ORS 238.360(2) and (3) (2011), a public employer’s COLA cap and COLA bank obligations are directly tied to a member’s monthly and annual retirement allowances. A member’s service retirement allowance based on the life pension component that is at issue in these cases is calculated from a formula that includes as its only variables the member’s number of years of membership in PERS and his or her “final average salary.” ORS 238.300(2)(a)(B).[6] A member’s number of years of membership accumulates as work is performed; thus, that variable is directly tied to earned and accrued remuneration for past service. However, the other retirement allowance variable, the member’s “final average salary,” is not so easily characterized, at least with respect to active members. “Final average salary” means the greater of the following:
“(a) The average salary per calendar year paid by one or more participating public employers to an employee who is an active member of the system in three of the calendar years of membership before the effective date of retirement *248 of the employee, in which three years the employee was paid the highest salary. The three calendar years in which the employee was paid the largest total salary may include calendar years in which the employee was employed for less than a full calendar year. If the number of calendar years of active membership before the effective date of retirement of the employee is three or fewer, the final average salary for the employee is the average salary per calendar year paid by one or more participating public employers to the employee in all of those years, without regard to whether the employee was employed for the full calendar year.
“(b) One-third of the total salary paid by a participating public employer to an employee who is an active member of the system in the last 36 calendar months of active membership before the effective date of retirement of the employee.”
ORS 238.005(9).
Insofar as retired members are concerned, both variables that determine the amount of COLA benefits— number of years of membership and final average salary — are directly attributable to their performance of pre-retirement service. Based on the holdings in Hughes and Strunk, those members have fully earned and accrued the disputed COLA benefits. The tax-exemption repeal in Hughes involved a change that, in violation of ORS 237.201 (1989), would have eliminated an earned benefit if it applied to previously performed service. Hughes, 314 Or at 31. The situation in Hughes was analogous to the challenge to the COLA amendment in Strunk in the sense that the amendment in Strunk applied to only certain retirees who had fully earned and accrued the benefit at issue there through previous service. Strunk, 338 Or at 221-24. Similarly, in this case, retired employees have fully earned and accrued the disputed COLA benefits based on their number of years of membership and their final average salaries. Accordingly, in my view, Hughes and Strunk control the analysis here with respect to retired PERS members. With respect to those members, the disputed COLA benefits are not modifiable at all.
The analysis for active members is somewhat different. Because those members will continue to earn and accrue COLA benefits as they perform future service, it is *249 necessary to determine whether the enacting legislature intended to preclude future legislatures from modifying their COLA benefits prospectively. Apart from the use of mandatory language, I discern nothing in the text or context of ORS 238.360 (2011) that indicates such an intent.
Calculating final average salary for a member who has not retired is, by definition, impossible. The question is what, if any, significance attaches to that fact in the modifi-ability analysis. The answer, in my view, is not much. Active members accumulate years of membership and, through past service, they also have the functional equivalent of a pre-amendment final average salary. Thus, in substance, the statutory variables that determine a retired member’s COLA benefits also exist, at least in proxy form, for active members. A proxy amount for final average salary, when coupled with an active member’s number of years of membership to the effective date of the statutory amendment, will result in a proportionately protected COLA benefit upon retirement. Nothing about the lack of a final average salary for active members suggests that the enacting legislature intended for the disputed COLA benefits to be prospectively nonmodifiable with respect to those members.
It follows, based on the gap-filling contract principles set out in Hughes and Strunk, that, in the absence of a legislative promise that the disputed COLA benefits would not be modified prospectively, the 2013 amendment to ORS 238.360(2) and (3) did not breach the PERS contract with respect to benefits to be earned and accrued by active members after the effective date of the amendment.
That conclusion is consistent with the broader statutory framework of the PERS system. In particular, ORS 238.600 provides:
“(1) A system of retirement and of benefits at retirement or death for employees of public employers hereby is established and shall be known as the Public Employees Retirement System. The Public Employees Retirement System consists of this chapter and ORS chapter 238A. It is the intent of the Legislative Assembly that the system be qualified and maintained under sections 401(a), 414(d) and 414(k) of the Internal Revenue Code as a tax-qualified defined benefit governmental plan.
*250 “(2) If the Public Employees Retirement System is terminated, or if contributions may no longer be made to the system, each member of the system has a nonforfeitable right to the benefits that the member has accrued as of the date of the termination, or as of the date that contributions may no longer be made to the system, to the extent that those benefits are funded.”
(Emphasis added.) Subsection (2) was added to ORS 238.600 by the 1999 Legislative Assembly. 1999 Or Laws, ch 217, § 9. At a hearing before the House General Government Committee on May 18, 1999, Steve Delaney, the legislative liaison for PERS, testified that the bill was intended to ensure that the PERS system was in compliance with the Employee Retirement Income Security Act (ERISA), 29 USC § 1001 et seq., and the tax exemption requirements of the Internal Revenue Code (IRC) for qualified retirement plans.
I recognize that, as a subsequently enacted statute, ORS 238.600(2) does not indicate what, if anything, the 1971 and 1973 Legislative Assemblies intended with respect to the prospective modifiability of the earliest statutory COLA benefit provisions. See Holcomb v. Sunderland, 321 Or 99, 105, 894 P2d 457 (1995) (“The proper inquiry focuses on what the legislature intended at the time of enactment and discounts later events”). Furthermore, as this court noted in Strunk, it is particularly important to ascertain the intent of the correct legislature when analyzing statutes to determine their contractual nature and extent because “the fundamental purpose behind such contracts is to bind future legislative action.” Strunk, 338 Or at 189. Moreover, because this case does not involve a plan termination, ORS 238.600(2) is not directly relevant. That said, the relationship between the PERS system and federal pension and tax law requirements is critical to the viability of the system, and, significantly, nothing in the legislative history of ORS 238.600(2) indicates that the 1999 Legislative Assembly thought that its enactment constituted a substantive change in the benefit structure of that system. Accordingly, the fact that that provision states that “accrued” PERS benefits are nonforfeitable in the event of a plan termination provides a lens through which to assess the prospective modifiability *251 of the disputed COLA benefits in this case. For that reason, I briefly discuss the relationship between ORS 238.600(2), ORS 238.360, and the anti-cutback requirements of federal law.
Because ORS 238.600(2) was enacted to comply with federal law, its use of the concept of “accrued” benefits must be understood in light of the meaning of that term under ERISA. As will be shown, the meaning of “accrued benefits” under ERISA generally comports with the idea, expressed above, that PERS benefits accrue — that is, accumulate periodically — as they are earned through the performance of covered service.
The central purpose of ERISA is to protect “employees’ justified expectations of receiving the benefits their employers promise them.” Central Laborers’ Pension Fund v. Heinz, 541 US 739, 743, 124 S Ct 2230, 159 L Ed 2d 46 (2004). Thus, ERISA’s anti-cutback rule prohibits pension plan amendments that decrease plan participants’ “accrued benefits.” 29 USC § 1054(g) (2006); see also Central Laborers’, 541 US at 744. The anti-cutback rule also appears in the Internal Revenue Code in materially identical form and disqualifies from tax-exempt status pension plans that violate its conditions. IRC § 411(d)(6); see also IRC § 401(a) (defining a qualified pension plan under ERISA); IRC § 411(a) (disqualifying from coverage under IRC § 401(a) pension plans which do not provide that an employee’s rights to normal retirement benefits be “nonforfeitable”); IRC § 501(a) (granting tax-exempt status to qualified pension plans). The parallel ERISA and IRC provisions serve the same function, which is to safeguard benefits that an employee has earned over time by fulfillment of a plan’s conditions. See Central Laborers’, 541 US at 743, 746. Once a participant performs work in exchange for a promised benefit, that is enough, other things being the same, to generate the sort of “justified expectation[]” that the anti-cutback rule is designed to protect. Id. at 743.
Because only an “accrued benefit” is protected by the anti-cutback rule, the scope of the rule depends on the meaning of that term. In relevant part, the IRC defines an “accrued benefit” under a defined benefit plan as “the *252 employee’s accrued benefit determined under the plan and * * * expressed in the form of an annual benefit commencing at normal retirement age.” IRC § 411(a)(7)(A) (i). Under the federal scheme, a promised benefit must correspond to current employment in order for that benefit to “accruef],” just in the sense that the promise of a benefit must predate an individual’s retirement or termination. See, e.g., Williams v. Rohm & Haas Pension Plan, 497 F3d 710, 714 (7th Cir 2007) (holding that COLA was an “accrued benefit” where promise of COLA predated the plaintiffs’ retirement). Where, under state law, a COLA benefit is tied to a member’s earned and accrued monthly retirement allowance as a means for maintaining the real value of the allowance, the COLA is a part of the accrued benefit under ERISA that ordinarily cannot be decreased after the employee has earned it through service to which it is attributable. See 29 USC § 1054(g)(1); Sheet Metal Workers’ Nat’l Pension Fund v. CIR, 318 F3d 599, 603 (4th Cir 2003) (“accrued benefit” accumulates during an employee’s service so as to become part of employee’s legitimate expectations at retirement under the terms of the plan then in effect).
The COLA cap and COLA bank benefits provided by former ORS 238.360(2) and (3) (2011) accumulate based on a member’s number of years of membership in PERS and the member’s final average salary. They are inseparably tied to a member’s service retirement allowance as a means of maintaining the real value of that benefit. Therefore, the disputed COLA benefits are “accrued” and nonforfeitable for purposes of ORS 238.600(2), but only insofar as they are attributable to service performed by a member before the effective date of the 2013 Legislative Assembly’s amendment to ORS 238.360(2) and (3).
To summarize: Retired PERS members have fully earned and accrued the disputed COLA benefits based on their number of years of membership and their final average salaries. Accordingly, the disputed benefits are not modifiable with respect to those petitioners who are retired members. In addition, active members have earned and accrued the disputed COLA benefits based on their number of years of membership and a proxy for their final average salaries on the effective date of the 2013 amendment to ORS 238.360(2) *253 and (3). However, in the absence of a legislative promise not to prospectively modify those benefits, the 2013 COLA amendment did not breach — let alone impair — active members’ contractual rights to COLA benefits with respect to service performed after the effective date of the amendment.
I join in the majority’s analysis of the other issues in this case. Accordingly, I respectfully concur.

 That requirement — lack of ambiguity — applies not only to the existence of a contract, but also to “the extent of the obligation created” by the contract, that is, whether its terms encompass a particular promise. Eckles, 306 Or at 397.

 And, as the majority notes, not every statutory usage of the words “shall” or “will” means that an enacting legislature meant to forever bind future legislatures to a particular benefit package. Sometimes, the use of such words can be meant merely to direct an administrative act by an executive agency.

 Nor do principles used in determining whether the obligation of a contract has been unconstitutionally impaired directly support the proposition set out in Hughes. The question here is not whether a retroactive modification of the COLA promises in the PERS contract would be unconstitutional, but whether those promises — either by their own terms or based on contract principles — are prospectively modifiable. It was the issue of unconstitutionality, not statutory contract interpretation, that this court briefly addressed in State ex rel. Thomas v. Hoss, 143 Or 41, 21 P2d 234 (1933), a decision to which the majority devotes *242 some attention. 357 Or at 199-201, 220. This court in Hughes mentioned Thomas in a footnote:
“In that case, this court held that the plaintiff’s salary earned before the effective date of a 1933 law, which reduced employees’ salaries, could not be affected by the law because of the Contract Clause of Article I, section 21, of the Oregon Constitution. The court held, however, that the then-new law could reduce plaintiff’s salary prospectively. 143 Or at 47.”
Hughes, 314 Or at 29 n 33. In its own words, this court in Thomas held that “after a salary has been earned!,] the public employee’s right thereto becomes vested and cannot be taken away by any legislation thereafter enacted.” Thomas, 143 Or at 47. Although that holding recognized the constitutional distinction between retroactive and prospective modification of remunerative employment benefits, the court in Thomas did not discuss the statutory construction or contract principles underlying that distinction, much less consider how to determine whether, by its terms, a benefit is prospectively modifiable.

 As an example of such a promise, the parties to an employment agreement can agree — expressly or by implication — at the outset of employment that the employer will not modify or eliminate an employee’s eligibility for benefits in the future. In Taylor, the defendant employer adopted a retirement benefits policy *244 that applied to the plaintiff employee’s position. The employee continued working for the employer for nine months, at which time the employer amended the retirement policy to exclude the employee’s position. When the employee claimed the right to participate in the retirement plan, the employer refused, arguing that, among other things, the amendment of the retirement policy precluded her participation in it. This court disagreed, holding that the policy included an irrevocable promise (or offer) that the employee would be able to vest in benefits and that the employee had accepted the offer by undertaking to perform the vesting condition of long-term service. Taylor, 265 Or at 450-51. Taylor had nothing to do with the prospective modifiability of a benefit. Rather, it was about vesting. The benefit remained available for eligible employees; it simply was impermissibly revoked with respect to the plaintiff.

 For OPSRP members, vested status is more restrictive. ORS 238A.115 provides, in part:
“(1) Except as provided in subsection (2) of this section, a member of the pension program becomes vested in the pension program on the earliest of the following dates:
*245 “(a) The date on which the member completes at least 600 hours of service in each of five calendar years. The five calendar years need not be consecutive, but are subject to the provisions of subsection (3) of this section.
“(b) The date on which an active member reaches the normal retirement age for the member under ORS 238A.160.”

 ORS 238.300 provides, in part:
“Upon retiring from service at normal retirement age or thereafter, a member of the system shall receive a service retirement allowance which shall consist of the following annuity and pensions:
«ifc H* %
“(2)(a) A life pension (nonrefund) for current service provided by the contributions of employers, which pension, subject to paragraph (b) of this subsection, shall be an amount which, when added to the sum of the annuity, if any, under subsection (1) of this section and the annuity, if any, provided on the same basis and payable from the Variable Annuity Account, both annuities considered on a refund basis, results in a total of:
“(A) For service as a police officer or firefighter, two percent of final average salary multiplied by the number of years of membership in the system as a police officer or firefighter before the effective date of retirement.
“(B) For service as other than a police officer or firefighter, including service as a member of the Legislative Assembly, 1.67 percent of final average salary multiplied by the number of years of membership in the system as other than a police officer or firefighter before the effective date of retirement.
«Hí ^ ^ ^
“(c) As used in this subsection, ‘number of years of membership’ means the number of full years of creditable service plus any remaining fraction of a year of creditable service. Except as otherwise provided in this paragraph, in determining a remaining fraction a full month shall be considered as one-twelfth of a year and a major fraction of a month shall be considered as a full month.”